# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No. 21-204-2 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| ERIC CHASE TORRENS, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is an application submitted on behalf of sixteen media organizations (the "Press Coalition" or "petitioners") seeking access to nine videos submitted in connection with the plea hearing for defendant Eric Chase Torrens held August 19, 2021. Pet'rs' Appl. for Access to Video Exs. ("Pet'rs' Appl."), ECF No. 76.[1] Torrens does not oppose public release of the videos. Def.'s Resp. Pet'rs' Appl. for Access to Video Exs. ("Def.'s Second Suppl. Resp."), ECF No. 78. The government opposes release of five videos taken from the U.S Capitol's closed-circuit video ("CCV") system on grounds that doing so would create a security risk. Gov't's Report & Position Regarding Public Release of Video Evidence ("Gov't's Resp.") at 2, ECF No. 67; *see also* Gov't's Explanation of Position as to Release of Video Evidence ("Gov't's Suppl. Resp."), ECF No 70.[2] One of Torrens's three co-defendants—Matthew

---

[1] This application was made pursuant to D.D.C. Local Criminal Rule 57.6, which authorizes "[a]ny news organization or other interested person, other than a party or a subpoenaed witness," to seek relief in criminal cases, D.D.C. LCrR 57.6, and D.D.C. Standing Order No. 21-28, which was entered at the behest of the same coalition of media organizations bringing the pending application and sets out a process for providing access to video exhibits in "criminal cases arising from the January 6, 2021 violent breach of the United States Capitol," *In re Media Access to Video Exhibits in Pretrial Capitol Cases*, D.D.C. Standing Order No. 21-28 (BAH) (May 14, 2021) ("D.D.C. Standing Order 21-28") at 2.

[2] As discussed *infra*, in Part III.A, the government also urged that the video exhibits not be deemed judicial records subject to the presumption of public access. *See* Gov't's Suppl. Resp. at 6 (citing *United States v. El-Sayegh*, 131 F.3d 158, 163 (D.C. Cir. 1997)). While the video exhibits are not judicial records merely by being referenced in

1

Bledsoe—also initially joined Torrens's objection to release of the videos, but has not updated his position to reflect Torrens' withdrawal of any objection. Bledsoe's Mot. Adopt & Join Filings Submitted by Co-Defendant Torrens & the United States ("Def. Bledsoe's Mot."), ECF No. 72.

For the reasons set forth below, petitioners' application is granted.

## I. BACKGROUND

Defendant Eric Chase Torrens was charged by indictment with two Class A misdemeanors and two Class B misdemeanors, on March 10, 2021, in connection with his unlawful conduct at the U.S. Capitol on January 6, 2021. Indictment, ECF No. 23. Specifically, defendant was charged with (1) entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); (2) disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); (3) disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). Indictment at 2–3.

On July 28, 2021, defendant executed a plea agreement with the government, in which he agreed to plead guilty to one of the Class B misdemeanors—parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G)—in exchange for dismissal of the three remaining misdemeanor counts against him in the Indictment. Plea Agreement ¶¶ 1, 4, ECF No. 73. The executed agreement was submitted to the Court that day, along with a Statement of Offense ("SOF") briefly describing defendant's offense conduct with reference to "surveillance footage and a selfie-style video," SOF ¶ 11, ECF No. 74.

---

the Statement of Offense submitted to the Court as an attachment to the parties' plea agreement, as the government concedes, the video exhibits did become judicial records when reviewed and relied upon by the Court to support the factual basis for Torrens's guilty plea before that plea was accepted by the Court, *id.* at 6–7.

2

As set out in the Statement of Offense, "Torrens drove from Tennessee to Washington D.C. to attend a rally protesting the election results on January 6, 2021," and then, after walking to the U.S. Capitol, at approximately 2:14 to 2:16 p.m., he unlawfully entered the restricted Capitol grounds, near the northwest scaffolding and stairs. SOF ¶ 10. He "spent time in the crowd by the inauguration stage on the west side of the U.S. Capitol building observing members of the crowd throwing items at law enforcement," and nevertheless proceeded to go "up the northern set of stairs underneath the scaffolding to the north west terrace near the Senate wing of the building." *Id.* Torrens then "entered a door to the Capitol which had been broken open." *Id.* ¶ 11. With an alarm "blaring in the background," Torrens said in a statement captured on video footage, "We're going in," *id.*, knowing "at the time he entered the U.S. Capitol Building that that he did not have permission to enter the building," *id.* ¶ 14. Torrens made his way through the Senate side of the Capitol building "into the Crypt, which is captured on surveillance footage." *Id.* ¶12. "After some time, he eventually moved toward the same door he entered, and ultimately exited the building." *Id.*

On July 29, 2021, a plea agreement hearing was scheduled for August 19, 2021, at the behest of the parties. *See* Notice of Hr'g (July 29, 2021). Several days before the hearing, the government was directed to submit to the Court the videos described in the Statement of Offense, and the parties were directed to provide their positions on public release of the video exhibits. Min. Order (Aug. 15, 2021). The government submitted the videos next day and filed a notice describing the following nine video exhibits referenced in the Statement of Offense: five videos were taken from U.S. Capitol CCV system and were designated "Highly Sensitive"; three were publicly available videos posted on social media; and one was obtained from co-defendant Bledsoe's cell phone. Gov't's Resp. at 1–2. The government opposed release of the five videos

designated "Highly Sensitive" under the previously-entered Protective Order, *id*. at 3; *see also* Protective Order (Torrens) ¶ 1.g, ECF No. 44, and Torrens opposed release of any videos, arguing, without citation to authority, that release of the videos would be "prejudicial," Def.'s Position on Public Dissemination of Video Discovery Material ("Def.'s Resp.") ¶¶ 5–6, ECF No. 68.

The parties were directed to file more fulsome explanations of their opposition to release, given that their initial filings did not engage with the relevant legal standard. *See* Min. Order (Aug. 16, 2021); Min. Order (Aug. 17, 2021). Both parties then submitted supplemental briefs elaborating on their earlier filings. *See* Def.'s Suppl. Objection to Public Dissemination of Video Discovery Material ("Def.'s Suppl. Resp."), ECF No. 69; Gov't's Suppl. Resp. Torrens's co-defendant, Matthew Bledsoe, also expressed his opposition, joining the parties' positions opposing release of any video exhibits. Def. Bledsoe's Mot.

At the plea hearing held on August 19, 2021, defendant's plea was accepted, and he was adjudged guilty on Count V of the Indictment, charging him with parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). Transcript of Hearing (Aug. 19, 2021) ("Hr'g Tr.") at 23:10–17, ECF No. 79. After the plea was accepted, the Court declined *sua sponte* to order the videos released because at least one of the parties objected to release of the six non-public videos, and no motion for their release was pending. *Id.* at 31:20–32:1.

Though petitioners' pending application for access to the video exhibits was apparently submitted to the Clerk's Office on August 18, 2021, before the hearing, it was not docketed until August 20, 2021 and thus was not under consideration at the time of the plea hearing. *See* Pet'rs' Appl. At the plea hearing, defense counsel indicated that counsel for petitioners had contacted

4

defense and government counsel the previous day indicating that an application for access to the video exhibits had been submitted. Hr'g Tr. at 32:8-20. The parties were informed that they would have an opportunity to respond once the application was docketed. *See id.* at 32:21–33:1 (Court stating: "[I]f and when I do see that motion from media applicants, you will be given an additional opportunity to respond to supplement whatever papers you have already submitted; but I will do that all on the docket so there is full transparency to everybody interested.").

Once the application was docketed, the parties were directed to respond. Min. Order (Aug. 20, 2021). Only defendant Torrens did so, indicating that he did not oppose the application. Def.'s Second Suppl. Resp. The government was directed to further explain its position, *see* Min. Order (Sept. 1, 2021), which it has now done, *see* Gov't's Further Explanation of Position as to Release of Video Evidence ("Gov't's Second Suppl. Resp."), ECF No. 80. Petitioners then filed, on September 12, 2021, a reply memorandum in support of their application. *See* Pet'rs' Reply Supp. Appl. for Access to Video Exs. ("Pet'rs' Reply"), ECF No. 82. Accordingly, after the opportunity for input from all interested parties, petitioners' application is ripe for resolution.

## II. LEGAL STANDARD

Petitioners' application raises both the First Amendment and common-law rights of access. *See* Pet'rs' Appl. ¶ 11. Only the common-law right of access is discussed below, as only that basis for public release need be addressed to grant petitioners their requested relief. *See In re Leopold*, 964 F.3d 1121, 1126–27 (D.C. Cir. 2020) (declining to reach First Amendment grounds for access where issue could be resolved on common-law grounds).

The D.C. Circuit has explained that "there is a 'strong presumption in favor of public access to judicial proceedings,' including judicial records." *Id.* at 1127 (quoting *United States v.*

5

*Hubbard*, 650 F.2d 293, 317 (D.C. Cir. 1980)). Yet "not all documents filed with courts are judicial records" subject to this presumption. *Id.* at 1128 (quoting *SEC v. Am. Int'l Grp.*, 712 F.3d 1, 3 (D.C. Cir. 2013)); *see also Am. Int'l Grp.*, 712 F.3d at 4 (finding consultant reports were not judicial records because district court "made no decisions about them or that otherwise relied on them"); *El-Sayegh*, 131 F.3d at 163 (finding plea agreement that played no role in any adjudicatory function was not judicial record). Instead, "whether something is a judicial record depends on the role it plays in the adjudicatory process." *In re Leopold*, 964 F.3d at 1128 (internal quotation marks omitted) (quoting *Am. Int'l Grp.*, 712 F.3d at 3). Documents and other materials filed in court "intended to influence the court" are judicial records. *Id.*; *see also id.* at 1128–29 (finding sealed orders, applications for orders and supporting documents in criminal investigation matters, and court dockets for these records, are judicial records); *League of Women Voters v. Newby*, 963 F.3d 130, 136 (D.C. Cir. 2020) (holding that "every part of every brief filed to influence a judicial decision qualifies as a 'judicial record'" (citing *MetLife, Inc. v. Financial Stability Oversight Council*, 865 F.3d 661 (D.C. Cir. 2017)); *see also United States v. Graham*, 257 F.3d 143, 151–52 (2d Cir. 2001) (holding that videos played at a pretrial detention hearing are judicial records).

The common law "right to inspect and copy judicial records is not absolute," *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978), and "may be outweighed by competing interests," *In re Leopold,* 964 F.3d at 1127. The Supreme Court has instructed that "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon*, 435 U.S. at 599. The competing interests that may overcome the presumption favoring public access to judicial records have been "crafted [] into a six-factor test" originating in *Hubbard*. *In re Leopold*,

6

964 F.3d at 1127. The *Hubbard* six-factor test "has consistently served as our lodestar" by "ensur[ing] that we fully account for the various public and private interests at stake," *MetLife, Inc.*, 865 F.3d at 666, in evaluating motions to seal or to unseal and provide public access to judicial records.

> The *Hubbard* test considers:
>
> (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings.

*In re Leopold*, 964 F.3d at 1131 (quoting *Metlife*, 865 F.3d at 665); *see also id.* at 1129–30 (explaining that unless "'Congress has spoken directly to the issue at hand,'" the "common-law standard enshrined in the *Hubbard* balancing test" governs "[]sealing decisions" (quoting *Metlife*, 865 F.3d at 669)); *Hubbard*, 650 F.2d at 317–22.

## III. DISCUSSION

The threshold question of whether the video exhibits are judicial records subject to the presumption of public access is addressed first before turning to application of the *Hubbard* test, which ultimately calls for release of the video exhibits.

### A. The Video Exhibits are Judicial Records

The government argued in its briefing preceding the plea hearing that the video exhibits should not be considered judicial records subject to the right of public access *unless* considered in accepting defendant's guilty plea. *See* Gov't's Suppl. Resp. at 4–6. As noted, *supra* n.2, the government urged the Court to accept the plea on the basis of the written Statement of Offense and without considering the video exhibits. That way, "these videos would not be considered judicial records as the Court would not have relied upon them in accepting the guilty plea." *Id.* at 6 (citing *El-Sayegh*, 131 F.3d at 163).

7

Federal Rule of Criminal Procedure 11 requires the court, in considering and accepting a guilty plea, to "determine that there is a factual basis for the plea" before entering judgment. FED. R. CRIM. P. 11(b)(3). "Th[is] requirement aims to 'protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge.'" *United States v. Melgar-Hernandez*, 832 F.3d 261, 264 (D.C. Cir. 2016) (quoting *McCarthy v. United States*, 394 U.S. 459, 467 (1969)). Moreover, in cases where, as here, the plea agreement specifies that the government will "not bring, or will move to dismiss, other charges," FED R. CRIM. P. 11(c)(1)(A), "the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report," FED. R. CRIM. P. 11(c)(3)(A). "Although 'district courts must exercise discretion in deciding whether to accept or reject a guilty plea, that discretion is not unfettered.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 745 (D.C. Cir. 2016) (quoting *United States v. Maddox*, 48 F.3d 555, 556 (D.C. Cir. 1995)). In particular, "trial judges are not free to withhold approval of guilty pleas . . . merely because their conception of the public interest differs from that of the prosecuting attorney." *Id.* (omission in original) (quoting *United States v. Ammidown*, 497 F.2d 615, 622 (D.C. Cir. 1973)). As the D.C. Circuit has explained, "[t]he Constitution allocates primacy in criminal charging decisions to the Executive Branch" and "the Judiciary generally lacks authority to second-guess those Executive determinations, much less to impose its own charging preferences." *Id.* at 737; *see also United States v Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring . . . are decisions that generally rest in the prosecutor's discretion."); *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."); *Citizens for Responsibility & Ethics in Wash.*

8

*v. FEC*, 993 F.3d 880, 887–88 (D.C. Cir. 2021) ("The vesting of all executive power in the President as well as his constitutional obligation to 'take Care that the Laws be faithfully executed,' has been understood to leave enforcement and nonenforcement decisions exclusively with the Executive Branch." (quoting U.S. CONST., art. I, § 1; art. II, § 3)); *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967) ("Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.").

Thus, courts "take the prosecution's charging decisions largely as a given, and assume a more active role in administering adjudication of a defendant's guilt and determining the appropriate sentence." *Fokker Servs.*, 818 F.3d at 737. This "more active role" is reflected in the procedural requirement that the district judge "determine that there is a factual basis for the plea" before entering judgment. FED. R. CRIM. P. 11(b)(3). To comply with the Rules and promote the public interest in the transparency in criminal proceedings, a district judge may appropriately request to see first-hand evidence referenced in the Statement of Offense rather than rely on the description provided by the parties in that document.

As the government concedes, the video exhibits "would become judicial records" "if the Court cho[se] to rely on the Videos to find a sufficient factual basis for the plea." Gov't's Suppl. Resp. at 7. The government's request that the Court *choose* not to rely on the materials concedes this prerogative. Where materials are referenced in filings submitted to the Court, evaluating those materials—and rendering them judicial records—provides the transparency necessary for the public to evaluate and understand the actions of both the Court and the government. *See* Hr'g Tr. at 30:6–12 (Court stating: "Looking at the relevant video evidence, which provides the

9

underlying evidence establishing a defendant's offense conduct, is helpful to understanding the offense conduct, the factual basis for the plea—and particularly where the Statement of Offense expressly references conduct captured on video—and sheds some light on the government's exercise of its discretion.").

The Court did in fact view and rely upon the video exhibits in accepting defendant's guilty plea. These video exhibits have therefore "affect[ed the] court's decisionmaking process," *Metlife*, 865 F.3d at 667, such that they are judicial records subject to the "strong presumption in favor of public access," *In re Leopold*, 964 F.3d at 1127 (quoting *Hubbard*, 650 F.2d at 317).

### B. Government's Objections Are Insufficient to Block Disclosure

The government's arguments against disclosure primarily rely on the strength of the asserted privacy interest and the potential prejudice from disclosure.[3] Specifically, the government objects to release of the five videos taken from the U.S Capitol's CCV system on grounds that doing so would create a security risk. Gov't's Suppl. Resp. at 2–3.[4] Conceding that "disclosure of one video may not present a significant security threat," the government argues that "the U.S. Capitol Police has a larger legitimate interest in restricting the disclosure of

---

[3] In the context of the *Hubbard* test, "privacy interests" are construed broadly to include the government's interest in limiting the disclosure of information in order "to guard against risks to national security." *Cable News Network, Inc. v. FBI*, 984 F.3d 114, 120 (D.C. Cir. 2021) (quoting *Hubbard*, 650 F.2d at 315–16).

[4] Due to the potential prejudice to defendants stemming from disclosure, *see In re Press & Pub. Access to Video Exhibits in Capitol Riot Cases,* Case No. 21-mc-46 (BAH), 2021 WL 1946378, at *5 (D.D.C. May 14, 2021); D.D.C. Standing Order 21-28 at 5, the defendants in this case were provided the opportunity to submit their positions on disclosure, Min. Order (Aug. 20, 2021). Defendant Torrens withdrew his previous opposition to release of the video exhibits. Def.'s Second Suppl. Resp. One co-defendant, Matthew Bledsoe, opposed release, *see* Def. Bledsoe's Mot., by simply joining defendant Torrens's earlier filing and expressing support for the government's position, without otherwise making any effort to describe his interest in preventing disclosure of the video exhibits or articulating any cognizable prejudice that would result from releasing the video exhibits. No assertion has been made, for example, by any defendant or the government, that the video exhibits are so inflammatory as to be capable of tainting the potential jury pool. *See* Hr'g Tr. at 31:8–16 (Court stating: "[G]iven the descriptions of the videos and the defendant's conduct already in the Statement of Offense, it is really hard to see how much more of the depiction in the videos would produce more prejudice for the defendant than the highlighted descriptions in the Statement of Offense; and I do think this is particularly true, since having watched the videos, it shows huge crowds inside the Capitol engaging in conduct fairly similar to the defendant's."). Bledsoe's brief opposition therefore raises no objection adequate to bar release of the video exhibits.

individual videos in an effort to avoid 'unfettered access' to CCV that may indeed give rise to a significant threat to the building and those victimized by the events of January 6, 2021." *Id.* at 3. In particular, the government expressed concern that these videos could be aggregated with others "to reveal non-public information about 'entry and exit points, office locations, and the relation of the crucial chambers and offices . . . to other areas of the Capitol.'" *Id.* (quoting Decl. of Thomas DiBiase ("DiBiase Decl.") ¶ 16, *United States v. Nordean*, Case No. 21-cr-175 (TJK), ECF No. 92-1). The videos, the government contends, could "be used to track individual rioters moving through the building thereby creating a visual pathway which other bad-actors could use in planning their breach point and pathway for future attacks." Gov't's Second Suppl. Resp. at 2. The government further contends that the footage discloses the "capabilities" of the cameras, *id.*, and "police tactics and capabilities" that could be used to undermine security at the U.S. Capitol, *id.* at 3.

Petitioners argue that the government has not rebutted the presumption of access. Pet'rs' Appl. ¶ 12. The government's asserted security concerns, petitioners argue, are too speculative to overcome the presumptive right of public access, *see* Pet'rs' Reply at 10, 13, and are undercut by extensive prior release of video footage taken at the Capitol on January 6, *see id.* at 7–13.

The government's reasons for preventing disclosure of the video exhibits, and thereby sealing them, are insufficient to overcome the public right of access to the five CCV videos at issue. First, the "need for public access," *In re Leopold*, 964 F.3d at 1131, to the video exhibits is very strong, as evidenced by the extraordinary public interest surrounding the events that took place at the U.S. Capitol on January 6, which prompted the Press Coalition to pursue a court-wide Standing Order governing release of video exhibits in cases arising from those events, *see* Mot. to Access Video Exhibits in the Capitol Riot Cases, *In re Press and Pub. Access to Video*

11

*Exhibits in the Capitol Riot Cases*, Case No. 21-mc-46 (BAH), ECF No. 1, and this Court to enter a standing order governing release of such exhibits, *see* D.D.C. Standing Order 21-28. Hundreds of cases have arisen from the events of January 6, with new cases being brought and pending cases being resolved by plea agreement every week. The public has an interest in understanding the conduct underlying the charges in these cases, as well as the government's prosecutorial decision-making both in bringing criminal charges and resolving these charges by entering into plea agreements with defendants. *See* Hr'g Tr. at 30:2–5 (Court stating: "In this context, it behooves the government to explain its prosecutorial decisions in how different kinds of conduct are being charged and resolved, and support those decisions with the evidence at hand.").

Second, "the extent of previous public access," *In re Leopold*, 964 F.3d at 1131, of the video exhibits weighs slightly against disclosure. This specific CCV footage from the U.S. Capitol has not been previously disclosed to the public, though, as petitioners note, many videos taken from the U.S. Capitol CCV system have been disclosed both through proceedings in the Capitol cases, and during former President Donald Trump's second impeachment proceedings, *see* Pet'rs' Reply at 6 ("Through releases pursuant to Coalition member requests, as well as video shown during the impeachment proceedings, a total of 28 CC[V] video clips depicting the Capitol riots have been released. The clips appear to have been captured from 21 different CC[V] cameras, and 18 of these CC[V] cameras capture the Capitol interior." (emphasis omitted)).

Third, "the fact that someone has objected to disclosure, and the identity of that person," *In re Leopold*, 964 F.3d at 1131, weighs somewhat against disclosure. The government objects

12

to disclosure and has asserted privacy and security interests in keeping the five CCV video exhibits sealed, but this factor must be considered in the context of the fourth and fifth factors.

Fourth and fifth, "the strength of any property and privacy interests asserted" and "the possibility of prejudice to those opposing disclosure," *id.*, weigh in favor of disclosure. Generally speaking, the government's interest in maintaining the security of the U.S. Capitol is indisputably very strong. Its asserted risk of prejudice from disclosure of the video exhibits, however, is speculative and attenuated. The government hypothesizes that bad actors could use the five videos at issue in this case, in conjunction with other video, to track the movement of individuals through the Capitol and thereby discern the floor plan. *See* Gov't's Second Suppl. Resp. at 1–2. This concern is too general to support the government's asserted need for secrecy. The only declaration cited by the government refers to the need to keep secret "entry and exit points, office locations, and the relation of the crucial chambers and offices (such as the Speaker's Office or Majority Leader's Office) to other areas of the Capitol." Gov't's Suppl. Resp. at 3 (quoting DiBiase Decl. ¶ 16). Concern about security in particularly sensitive areas of the U.S. Capitol is warranted and might weigh against disclosure in other circumstances, but the government has not even attempted to argue that these videos will disclose such sensitive information. Indeed, the areas of the Capitol in the videos are generally open to visitors taking public tours. *See* U.S. Capitol Visitor Center, *Plan a Visit*, https://www.visitthecapitol.gov/plan-visit (last visited Sept. 145 2021) (stating that guided tours include the Crypt). To justify secrecy, the government must articulate a *specific* threat and may not generally invoke its interests in the security of the U.S. Capitol without articulating how these videos might undermine particular security interests. The concerns articulated in the DiBiase Declaration are

13

simply too generalized to show a risk of prejudice from disclosure of the five videos at issue in this case.

Moreover, the government has already released video from inside the Capitol in other cases and even more videos taken by individuals inside the Capitol on January 6 have been made publicly available. *See* Pet'rs' Reply at 8, 10–11 & n.4. The government does not explain how the information it seeks to protect could not already be obtained by, for example, reviewing already-public videos taken inside the Capitol, and the government does not articulate a particular threat stemming from the release of these particular videos. As petitioners persuasively argue, the asserted security risk is undercut by the already extensive release of CCV footage from the Capitol. *See* Pet'r's Reply at 9–10.

Similarly, the government fails to explain how knowledge regarding the "perspectives and capabilities of the cameras," Gov't's Second Suppl. Resp. at 2, would provide information that would compromise the security of the building, or how the video exhibits would disclose "police tactics and capabilities," *id.* at 3, and compromise Capitol security. Petitioners observe that a vast amount of released footage—including 50 videos captured on body-worn cameras—depict officers' actions during the January 6 storming of the U.S. Capitol, *see* Pet'rs' Reply at 11, and the government has not explained how the police tactics and capabilities depicted in these videos might differ from those already released.

Sixth, "the purposes for which the documents were introduced during the judicial proceedings," *In re Leopold*, 964 F.3d at 1131, weigh in favor of disclosure. The video exhibits were submitted for the Court's consideration in accepting the defendant's guilty plea because they were referenced in the Statement of Offense submitted by the parties to support the plea. The public has a particularly strong interest in understanding the factual basis for the

14

government's plea agreements and, relatedly, understanding the government's exercise of discretion in these cases.

## IV. CONCLUSION AND ORDER

For these reasons, the government has not rebutted the "strong presumption in favor of public access," *In re Leopold*, 964 F.3d at 1127 (quoting *Hubbard*, 650 F.2d at 317), to the video exhibits submitted in connection with defendant's plea hearing, and petitioners' application is granted. Accordingly, it is hereby

**ORDERED** that petitioners' Application for Access to Video Exhibits, ECF No. 76, is GRANTED; it is further

**ORDERED** that the government shall promptly make the video evidence submitted to the Court on August 16, 2021, in connection with defendant's plea hearing held August 19, 2021, publicly available without restrictions by providing access using the "drop box" technical solution described in D.D.C. Standing Order No. 21-28; and it is further

**ORDERED** that the government is directed to provide counsel for petitioners with the necessary credentials required to access the video exhibits.

**SO ORDERED**

Date: September 15, 2021

_____
BERYL A. HOWELL
Chief Judge