**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
 UNITED STATES OF AMERICA,      .
                                .
            Plaintiff,          .   CR No. 21-0382 (PLF)
                                .
       v.                       .
                                .
 CHRISTOPHER WARNAGIRIS,        .   Washington, D.C.
                                .   Monday, March 25, 2024
            Defendant.          .   10:26 a.m.
 . . . . . . . . . . . . . . . .
```

**TRANSCRIPT OF PRETRIAL HEARING**
**BEFORE THE HONORABLE PAUL L. FRIEDMAN**
**UNITED STATES DISTRICT JUDGE**

<u>**APPEARANCES**</u>:

For the Government:          REBEKAH LEDERER, AUSA
                             ANDREW HAAG, AUSA
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530

For Defendant:               MARINA MEDVIN, ESQ.
                             Medvin Law PLC
                             916 Prince St
                             Suite 109
                             Alexandria, VA 22314

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  This is criminal action 21-382, United States of America versus Christopher Warnagiris. Counsel, please approach the podium and state your appearances for the record.

MS. LEDERER:  Good morning, Your Honor.  AUSAs Rebecca Lederer and Andrew Haag on behalf of the United States.

THE COURT:  Good morning.

MS. MEDVIN:  Good morning, Your Honor.  Marina Medvin on behalf of Mr. Warnagiris.

THE COURT:  And we have Mr. Warnagiris on the screen, and Mr. Cooperstein is?

MS. MEDVIN:  He works with the defense team, Judge. He's counsel.

THE COURT:  Okay.

So let me just say a couple of things preliminarily. First of all, I want to thank everybody for switching gears and agreeing to do this in person this morning.  Ms. Medvin sent an email this morning.  I should have thought of it, because I think pretrial conferences work better when everybody's physically present, even though Mr. Warnagiris isn't here, in terms of looking at exhibits and things like that.

Secondly, he will be able to see you if you stand at the podium when you speak.  If you stand anyplace else in the courtroom, or sit at your table, he won't be able to see you.

1    As I understand it, he can see me, and he can see whoever's at

2    the podium.  And, Mr. Warnagiris, good morning to you.  If you

3    can't hear us or have any technical problems, just let me us.

4            THE DEFENDANT:  Good morning your.  I can hear you.

5    Thank you.

6            THE COURT:  I had some thoughts about how to proceed.

7    One is I'm going to have some questions about the *Brady* request

8    that I would like to get clarified, and I'll issue an opinion on

9    *Brady* later this week.

10           Secondly, there are a bunch of things that I'm calling

11   "legal issues," and they rise, in various contexts, some in the

12   debates about bench instructions which become easier to resolve

13   the legal issues in Ms. Medvin's brief.

14           Thirdly, you know, some of the questions about bench

15   instructions are kind of not all that relevant at the moment

16   because it's a bench trial.  They're relevant in terms of what

17   the government must prove and what the defense must defend

18   against as the trial proceeds, but if there are certain

19   questions that are open, they can be resolved at the end of

20   the trial, too, as I write an opinion.  But we'll go through

21   everything.

22           And then I got the government's exhibits in a notebook this

23   morning, and an exhibit list, and I expect that we'll have

24   Ms. Medvin's now that she's here too, and we can talk about

25   exhibits and witnesses sort of at the end, at least that's sort

1    of at the way I thought we'd proceed, starting with *Brady* and

2    moving on to the legal issues.  I'm happy to do it in a

3    different order if you all prefer.  Anybody have anything to

4    say, or should I just proceed?

5              MS. LEDERER:  That's amenable to the government,

6    Your Honor.

7              THE COURT:  I want to clarify a couple of things,

8    Ms. Medvin, about your *Brady* request and the government's

9    response.  So there are a lot of different pieces of paper.

10   One, in Docket 62 on page 3, you request the face-trace list of

11   publicly available of photos and videos of Officer Warner.

12           And on the same page, page 3 of document 62, you ask the

13   government to identify, quote, other material exculpatory and

14   favorable evidence relating to Warner's interactions with

15   January 6 defendants not, your supplement, you say  in the

16   face-trace list.

17           And then in Docket 80, your supplement, you say exculpatory

18   evidence, namely a face-trace list of body-worn cameras and

19   recordings.  As I'm calling them requests 1 and 3, those are

20   fairly narrow.  They are photos, videos, and body-worn cameras

21   anytime Officer Warner is in the picture.

22              MS. MEDVIN:  Correct.

23              THE COURT:  The quote-unquote second request, "other

24   material, exculpatory, and favorable evidence," is very broad.

25   So I want to know what you are really asking for, how much or

1    how little or somewhere in between are you really asking for.

2         MS. MEDVIN:  That's the area where we're unsure what's

3    available.  So we don't know what specifically to ask for and

4    that one follows the first one, because the first one would

5    potentially give us more insight on what else to ask for or what

6    the government, after reviewing the first request, would see as

7    relevant exculpatory as adjacent to the primary evidence, to

8    provide that as well.

9         So it's just to cover our bases in that sense.  We don't

10   know specifically what to ask for except other than at the

11   minimum we have uncovered, through completely random preparation

12   for this trial, video of Officer Warner directing the protesters

13   that rose questions in my mind about the statements he has made

14   in this case and in other cases, and I simply wanted to see what

15   else was out there.  We know for a fact that the government is

16   able to do face traces.

17        THE COURT:  Well, let me get more specific.  In my

18   view, the government has an obligation -- they say they don't

19   have an obligation to create evidence.  I agree they don't have

20   an obligation to create evidence.  But they do have an

21   obligation to search.  And they have an obligation to search the

22   prosecutors' files and the files of any law enforcement agencies

23   that have worked in the investigation/prosecution in this case.

24   So it should be fairly easy to provide you with photographs,

25   videos, and body-worn camera of Officer Warner by going to the

1    face-trace list, as I understand the face-trace list.

2        The broader request -- I guess my question for the

3    government is, is their argument about your broader request a

4    legal argument, or is it also a burdensome argument and is it

5    just too time-consuming because the request is so non-specific?

6    And I say that by contrasting this case, these cases, from what

7    you and I and the prosecutors are used to.

8        You can ask for all exculpatory evidence in your drug

9    conspiracy case, and normally it's not going to be that

10   burdensome.  But if you ask to search for all exculpatory

11   evidence in this case, where we know that there are thousands

12   and thousands of things -- now, again, if we just do the

13   face-trace list, traced to Officer Warner, as I read the papers

14   that you've all filed, that shouldn't be a big problem.  The

15   government doesn't want to do it and they think they've got a

16   good legal argument, but it shouldn't be a burdensomeness

17   problem.

18       But they're looking for all exculpatory and favorable

19   evidence relating to him and his interactions that could include

20   text messages, emails, all sorts of things, and there are

21   hundreds of thousands of potential things.  So I'm trying to get

22   from you what you really want, to the extent you can tell me,

23   and from them, is their argument legal or legal and

24   burdensomeness?  And once I get a clearer answer, if there

25   is one, I'll issue an opinion in the next couple of days.

1          MS. MEDVIN:  Judge, as far as the request for

2   additional evidence related to Officer Warner, that's also

3   relatively simple to do through word searches.  The government

4   has the ability to search their files for his name, for example,

5   or his initials, but the government would be able to do this

6   relatively simplistically through word search.  A variety of

7   information would come up, and then they'd have to search

8   through that, but it's actually pretty simplistic.  If you do

9   a word search for his name, only things that either contain his

10  name or mention it would come up in the search, which would then

11  be relevant and you just sort through that as to what is

12  exculpatory or relevant to this case.

13          THE COURT:  And then if that is doable and not

14  burdensome, then within that universe of things, they would be

15  obligated and under *Brady* to turn over favorable and exculpatory

16  under *Giglio* impeachment.

17          MS. MEDVIN:  Yes, sir, especially if he takes the

18  stand in this case.

19          THE COURT:  Another thing you mentioned is

20  civilian-created video.  Are you asking that they go outside the

21  universe of material that is already in their files or the files

22  of their agents?

23          MS. MEDVIN:  Both.  Number one, I think the government

24  already saved everything in a database because they would have

25  to save all of the available video evidence; otherwise, it can

1    be deleted from the internet.  So I believe the government

2    has already saved all publicly available relevant video to a

3    database, which I think they have to do under their discovery

4    obligations to the defendants in the January 6 cases.

5        So I believe everything's already saved, so they can search

6    their databases.  But the way that their face traces work is

7    they search both the available online database, it's a robot,

8    it's AI.  It's artificial intelligence searches, what's

9    available in a public database, let's say.  So things through

10   Google or whatnot, and the robot's going to also search in the

11   database you privately hold.  Whether the database is public or

12   private, the software, the AI, can search it either way.

13        THE COURT:  Unless that civilian-created material has

14   found its way into the files of the prosecutors' offices or the

15   law enforcement agencies working with them, it's theirs to give,

16   right?

17        MS. MEDVIN:  These robots that they use are there to

18   identify evidence.  So they have -- the government's database, I

19   think last time I checked, was 4.9 million things.  I would have

20   to check again.  It's very difficult for the defense to access

21   all the January 6 evidence.  We have to go through like a

22   special login process that constantly requires us to have new

23   credentials.  I have to have a new password --

24        THE COURT:  Here's my problem, and it gets back

25   to basic *Brady*.  And this was written before AI and all this

technology, but if they have gone outside the government to find

evidence somehow.  But what they have searched, through robots

or otherwise, electronically and AI, has not found itself in

their 4.9 million things in their database, if that's the

number, that gets to the government's argument about -- and I

understand that the government's argument about *Brady* is much

narrower than my view of *Brady*, but they still don't have an

obligation to go to private parties and get stuff unless they've

already gotten it.

A big defense contractor case, they may have gotten a lot

of stuff from Lockheed or Boeing or whatever, and then it's in

their files, or it's in the FBI's files, but there's also a lot

of other stuff out there that they may have looked at, whether

they've done it through robots or AI or whatever, which they've

decided that they don't need.  And the FBI -- let's take the

investigating agencies.  They've not taken hundreds of thousands

of documents from Boeing or Lockheed.  They've taken only 10,000

documents from Boeing or Lockheed and because they think it's

relevant, and relevant includes both inculpatory and exculpatory.

Now, it's possible that a good prosecutor would say to

them, go back to Boeing because we're interested in this, that,

and the other thing, and then it also becomes the FBI's files

and the prosecutor's files.  But this gets to the government's

argument, to paraphrase, they're not required to create evidence;

but in my view, they are required to search for stuff they or

their law enforcement partners have in their files.

They've already done that and decided what they think is helpful to them, and presumably, if they've come across stuff that they think is exculpatory, they've met their *Brady* obligations.  But what they may not have done is what you're now asking for, to focus on one particular officer.  They're asked to go back to look in a more nuanced way for exculpatory evidence about Officer Warner, whereas before, while they were preparing for trial and deciding what to indict and what to present to the grand jury, they may have come across some exculpatory stuff, but they may not have been focused entirely on Officer Warner.

But I don't think they have an obligation to go out to Boeing or Lockheed in my example or other, quote, "civilian-created" places unless it's already in the files.  And that's my view.  So I guess I'd like to ask the government: What is this private actor/public actor stuff, what's the civilian-created, is there civilian-created stuff that they've gotten in their files, and is their argument about her broader request --

I mean, if you want to say more you can, but in my view you're going to lose on the body-worn camera and on the videos and on the photos.  The question is in her broader request.  Are you resting on legal arguments, or is it also an argument at this point that it's so broad that it's burdensome and time-consuming?

1          MR. HAAG:  Your Honor, with respect to the broader

2    concerns and burdensome concerns, I'd ask the opportunity to

3    approach with my trial supervisor who's in the gallery.

4          THE COURT:  Well, I've read your *ex parte* filings, but

5    you want to still do this *ex parte*?

6          MR. HAAG:  Based on the conversations that have been

7    happening in the court today, I think it would be appropriate,

8    yes.

9          THE COURT:  Okay.  Let's have this conversation,

10    but limit it to the stuff that truly needs to be *ex parte*.

11    Ms. Medvin knows you filed an *ex parte* affidavit.  She just

12    doesn't know what's in it.  And let's limit it to that so that

13    everything else that's part of your argument can be done in the

14    public courtroom so everyone can hear, including Mr. Warnagiris

15    and this part of the transcript will be under seal.

16      How do we  do this?  Do it here, or we do it over there?

17    Does it matter?  The court reporter doesn't care.  If we put it

18    on the husher, that will be sufficient?

19          THE DEPUTY CLERK:  I don't know if he'll be able to

20    hear on zoom.

21          THE COURT:  The court reporter may not?

22          THE DEPUTY CLERK:  The court reporter's on Zoom.

23          THE COURT:  I know.

24          THE DEPUTY CLERK:  So we can --

25      (Court conferring with court reporter.)

1          THE COURT:  So we'll exclude Mr. Warnagiris and

2    Mr. Cooperstein, and we'll ask Ms. Medvin to leave for a few

3    minutes, and then we'll call her back.

4          She's left the courtroom, and Bryan Wayne our court

5    reporter will be able to hear.

6                    EX PARTE UNDER SEAL





















OPEN COURT

        THE COURT:  All right.  So we had a session *ex parte*

without Ms. Medvin and Mr. Warnagiris being present.  Mr. Haag's

going to repeat some of the arguments that didn't need to be

1    based on the *ex parte* affidavit, and then Ms. Medvin can

2    respond.

3            MR. HAAG:  Thank you, Your Honor.  So I think starting

4    with the -- I know the threshold question here is whether or not

5    the argument before court is a valid *Brady* claim by the defense.

6    The government is arguing that it is not a sufficient *Brady*

7    claim.

8            Yes, there is this video of then Officer now Sergeant

9    Warner, of Sergeant Warner interacting with rioters, speaking

10   with some of the them on the west front, trying to persuade them

11   not to be riotous, not to be chaotic.  The line gets breached in

12   or around the outside of the East Rotunda doors, and then there's

13   some commentary between Sergeant Warner and the other rioters

14   that one of the rioters describe him as being particularly nice.

15           So that's kind of the full extent of the video before the

16   court, but that is a publicly available video that was brought

17   to the government's attention by the defense.  And based on that

18   video, the defense is now arguing that that triggers a *Brady*

19   obligation to search through the government's complete holdings

20   for these additional videos, the additional videos that may or

21   may not exist, and that's kind of the crux of it, is it's

22   speculative.

23           In addition to this idea of there hasn't been a complete

24   argument as to what the *Brady* evidence is, there's the

25   speculation that the videos exist.  It's just there's this one

1    video; therefore, others videos must exist.

2          THE COURT:  But she's now making a request, and *Brady*

3    says if you're requesting favorable evidence, and even if it's

4    not requested, if you're aware of it you have to produce it.

5    You're not aware of any, as you stand here this minute, but

6    she'd made a specific request, and you would say it's

7    speculative or a fishing expedition or whatever, but it's not.

8          She says, I've seen this and this leads me to believe that

9    it's possible, and *Brady* says possible is enough, that there's

10   other stuff that is similar to this that will help me persuade

11   the factfinder.  And that's where the next piece is.  Does it go

12   to the elements of particular offenses, or does it go to Officer

13   Warner's credibility, which is more *Giglio* than *Brady*, I guess.

14   But she has a predicate for her request.

15         MR. HAAG:  Your Honor, I don't believe the defense

16   has made clear exactly where this video falls.  The only thing

17   in the filings has been this is exculpatory and relevant to the

18   defense.  This is relevant for impeachment, and that's kind of

19   the full extent of the proffer made by the defense for what this

20   video provides in terms of a *Brady* obligation for the

21   government.

22         And I'm moving on from those two points into the

23   government's obligation.  I know Mr. Rosen discussed the FBI's

24   ability to run facial recognition.  That is one of the -- an

25   option for this case, but it creates some difficulties for the

government in terms of a ballooning obligation for the
government to run facial recognitions against officers in every
single one of these cases.  So there is a bit of a burden there
as well, but it's also not a perfect tool.

So the concern is a possibility for the government to run
afoul of any order of the court to conduct this review of its
case: perhaps the facial recognition software wasn't able to
capture a particular video of the subject officer, and by not
capturing that video and not including it in any output report,
the government could somehow be in violation of the court order
to locate that video is the concern there.

And that could be just the officer's face, but as you can
see in the video, Your Honor, Sergeant Warner has face covered
for a lot of the day, and that often requires having a very good
view of the digital space in order to actually register it.  So
there is a significant concern that the government wouldn't be
able to comply with this.

THE COURT:  Well, there may be situations where, if
you run facial recognition tracing, that there may be particular
videos and photographs that won't come up because he's got his
face covered.

MS. LEDERER:  I'm sorry.  If you could --

THE COURT:  That's all right.  You go ahead with your
argument.

MR. HAAG:  So turning next, Your Honor, with this

whole searchability aspect, defense is asking for all of the
exculpatory evidence that the government has, the government has
this ease of searching, which I think is just simply not correct
that the government has exclusive control over this.  Defense
has its own capabilities of looking through Relativity.  It has
access to the contractor that developed the database to work
through that.

THE COURT:  Well, with respect to her argument about
a name search for Officer Warner, are you saying that she has
the same capability you have?

MS. LEDERER:  Yes, Your Honor.  The database allows
you to search all of the documents that are on the database,
certainly not the videos because there's no words associated
with it, but any 302s produced by the FBI related to Sergeant
Warner, those can be readily searchable on the Relativity
database.

Ms. Medvin has access to that.  I certainly understand
the difficulties with accessing Relativity.  I have my own
difficulties with accessing it sometimes, but I'm able to work
with the contractor and get my access and search through it as
need be.

With the size of the database and the number of documents
that are on there, it is certainly difficult to search through
and cyst through just based on that sheer size but the
functionality is the same for the government as it is for the

1    defense.

2          THE COURT:  Okay.  Anything else you want to say?

3          MS. LEDERER:  I think that's all, Your Honor.

4          THE COURT:  Ms. Medvin?

5          MS. MEDVIN:  I would like to respond to three issues

6    raised by the government.  The first one is the statement that

7    if there is let's say a portion of the face covered that AI

8    might not be able to search for the face.  That's not true.

9    I've actually observed presentations on how the AI works.  It

10   could looks for colors, it could gender even, it could look for

11   specific items --

12         THE COURT:  But you're only asking for them to look

13   for his face.  That's what the face trace does.

14         MS. MEDVIN:  The face trace is able to create an

15   image, so if it's searching --

16         THE COURT:  But they don't have to create evidence.

17         MS. MEDVIN:  No, no, no.  The way that the program

18   works is if it's programmed to look for an image of Officer

19   Warner's face and it has a mask, it could look for that type of

20   image as well as it could look for an image without the mask.

21   It could look for whatever it's programmed to look for is my

22   point.  It is a program that can be programmed.

23      The fact that certain videos might not come up and the

24   government would fall short of its obligations, well, that's

25   just human nature.  Anytime the government searches for

1    evidence, they may not find something inadvertently.  That's

2    not a reason not to pursue your obligations under *Brady*.

3         As far as access to Relativity, which is the database where

4    the government uploads general January 6 evidence that's the

5    database I was previously it does have the ability for me to do

6    keyword searches, and I am able to and have looked for Officer

7    Warner's name in that database.

8         However, that database only has documents which the

9    government uploads.  And the government doesn't upload

10   absolutely everything in its possession to that database.

11   The government slowly uploads things depending on the process of

12   a particular case.  So, for example, I needed certain documents

13   related --

14        THE COURT:  If they do a search of Relativity by name,

15   if not everything's in Relativity, they'll have the same problem

16   you're saying you'll have.

17        MS. MEDVIN:  They have additional documents outside of

18   Relativity.  Even for this case I have to go to the government

19   to retrieve certain documents from another case that was not in

20   Relativity.  But it's the same thing.  They would have to search

21   through separate databases that I don't have access to.  So,

22   yes.  I have access to Relativity, but Relativity is not a

23   complete database of evidence the government is in possession

24   of.  The government has additional evidence outside of that.

25        THE COURT:  Okay.  Anything else on *Brady*, or can we

1   move on for today?

2          MR. HAAG:  Your Honor, I think between the briefings

3   and the government's statements today, I think we've made clear

4   how the government views the nature of this requesting heavily

5   burdensome and could balloon so nothing further.

6          THE COURT:  Thanks.  Let's move on.  And so there are

7   what I'm calling "legal issues," which may also impact other

8   things.  And let me start with the 111(a) 0issue, and I really

9   don't think I need additional arguments.  You've made your

10  arguments.  But if you want to perfect the record after I say

11  what I'm about to say, that's fine.  And the question -- give

12  me a second.

13         The question under 111(a) is what the government needs to

14  prove, and the government argues in response to -- there's a

15  motion to limine to define "another felony," and that is under

16  18 United States Code § 111(a).  That's Docket 115.  The

17  government argues that to meet its burden under Count 3, which

18  is the 111(a)(1) count, the government must prove that the

19  defendant acts either -- that his acts either involve physical

20  contact with the victim of that assault or the intent to commit

21  another felony.  And the question is what does "another felony"

22  mean.

23         The government says, for a violation of 111(a)(1) to be a

24  felony, the other felony from 111 -- let me go back.  Defendant

25  is relying to a large extent on an opinion by Judge Amy Berman

Jackson, but the government says that the opinion or transcript
on which the defendant relies was really in the context of
sentencing and the sentencing guidelines.  And Judge Jackson
actually later clarified in two subsequent opinions that that
was about sentencing.

But with respect to what the government must prove under
111 in terms of what is another felony, she held that the phrase
"another felony" has to be accorded its plain meaning, and a
violation of 231(a)(3) can serve as another felony for purposes
of Section 111(a)(1) even if some of the underlying conduct is
the same between 111 and 231(a)(3) because they have different
elements.  And that was in *United States v. Samuel Camargo*,
21-0070.

She also said in *United States v. John O'Kelly*, Criminal
Action 23-0061, that while both the civil disorder charged in
231 and the Section 111 charge are based on the same factual
predicate, that does not mean that 231 cannot serve as the other
felony for purposes of enhancing a penalty for assault under
111(a).

She notes that, first of all, the defendant relied on not
on any legal authority but on Judge Jackson's own comments at
sentencing.  She discusses the issues and provided an analysis
but says, yeah, that in her view the phrase "another felony"
must be accorded its plain meaning, and a violation of 231(a)(3)
can serve as another felony for purposes of 111(a)(1) and that

1    the indictment is not defective in any respect on that count.

2         So I am going to deny the defense motion in limine about

3    "another felony," Docket 115, on the basis of Judge Jackson's

4    two opinions unless there's anything else that needs to be said

5    about that.

6         MS. MEDVIN:  Judge, I raised two arguments which --

7    some of which are supported by her opinion, and the other one

8    is a little bit independent of it.  The first is defining the

9    phrase "another."  Well, what is "another"?  We talked about it.

10   It's an interesting word in that it has two completely

11   contrasting definitions.  "Another" means different or distinct

12   from the first one considered, or that one is that it's in

13   addition to one more of the same kind, which are two completely

14   contradictory definitions.

15        And then we talked about the language, the "intent to

16   commit," which is a future expectation as opposed to the word

17   "committed" or "committing," which would be past tense or

18   present tense.  We're talking about the tense of the word.

19   So we raised in two different formats from that action two

20   different arguments.

21        And I don't believe that the opinions from Judge Jackson,

22   I don't believe that they address that.  They may address the

23   word "another" where she chooses -- I'm not sure why -- to use

24   different definitions of the word "another" for sentencing

25   versus for the trial, but it doesn't address the intent to

1    commit language which is a future expectation, an intent to

2    commit as opposed to "committed" past or "committing" present.

3         In the way that the indictment is presented in this case,

4    the defendant simultaneously is said to be committing two

5    offense at the same time, present tense.  And so if we look at

6    the code section "intent to commit," which is invoking a future

7    expectation, it would not fit the indictment of the present

8    tense where he's currently committing.  That's the understanding

9    we have as far as the textual reading of 231 -- I'm sorry -- of

10   111(a).

11        One more issue, Judge.  Judge Jackson -- I have not briefed

12   this, but Judge Jackson's opinion basically says 231 has

13   distinct elements, and what it's doing in order to obtain that

14   is to say, well, 231 doesn't fit into 111(a) as a lesser-

15   included offense even though it has similar language because it

16   has this other separate element of civil disorder.  But civil

17   disorder, if we look at that definition, is a jurisdictional

18   element and is talking about the entire language dealing with

19   civil disorder and everything after that has to do with federal

20   jurisdiction for the offenses.  And that's not supposed to be

21   considered for purposes of *Blockburger.*  So if we look at --

22             THE COURT:  Say that again?

23             MS. MEDVIN:  The test for looking at offenses to

24   see if they're the same or if one is a lesser-included offense.

25   The one issue that we don't look at in a code section is the

1    jurisdictional element.  In 231, the "another offense" that the

2    government wants to rely on, in 231, the civil disorder is a

3    jurisdictional element.

4            THE COURT:  Yeah.  They're -- well, put it this

5    way:  231, the conduct of the defendant must occur during the

6    commission of a civil disorder.  The defendant doesn't him or

7    herself have to do the civil disorder.  There has to be a civil

8    disorder going on.  And that civil disorder must obstruct,

9    delay, and adversely either affected commerce or affected the

10   function of any federally protected function.  Maybe that's the

11   same point you've been making.

12           MS. MEDVIN:  Yes, sir.  So that's a jurisdictional

13   element.

14           THE COURT:  Yeah.

15           MS. MEDVIN:  It's not an element of the offense for

16   the defendant.  So if we remove that from comparing the elements

17   of the two offenses?  Not distinct.  Civil disorder once we --

18   I'm sorry.  The 231(a), once we remove civil disorder, becomes a

19   lesser-included offense of 111(a).

20           THE COURT:  You're saying that 231's a lesser-included

21   offense of 111?

22           MS. MEDVIN:  Absolutely.  If we remove --

23           THE COURT:  What's the case law --

24           MS. MEDVIN:  -- the civil --

25           THE COURT:  -- that says --

1         MS. MEDVIN:  -- if we understand civil --

2         THE COURT:  What's the case law --

3         MS. MEDVIN:  -- disorder to --

4         THE COURT:  -- that --

5         MS. MEDVIN:  -- jurisdiction.

6         THE COURT:  What's the case law that says that?

7         MS. MEDVIN:  Court's indulgence.

8    Judge, there's a new case out of the Eleventh Circuit

9    decided January 18, 2024, *United States of America v. Pugh*.

10         THE COURT:  Spell the last name?

11         MS. MEDVIN:  P-U-G-H.  Eleventh Circuit Court of

12    Appeals.  I don't have the citation.  It was Circuit Judge

13    Brasher's decision.  The Docket number.  I have Docket

14    120-CR-00073-TFM-B-1.  This is an appeal from the United States

15    District Court for the Southern District of Alabama, and it

16    discusses 231(a)(3), and it talks about the jurisdictional

17    element.

18    But there is also case law from the Fifth Circuit Court of

19    Appeals back in 1987 that talks about how for purposes of the

20    *Blockburger* test we exclude jurisdictional elements.  So if we

21    consider the two cases together -- and as I said, I'm sorry I

22    have not briefed this issue.  It's relatively new based on the

23    new *Pugh* decision which cites this as a jurisdictional element.

24    Once we consider this in full and understand, well, if in fact

25    civil disorder is a jurisdictional element and we exclude for

purposes of the *Blockburger* test everything in comparing 231 to 111(a), then it's a lesser-included offense.

THE COURT:  Well, 231 requires the commission of an act to obstruct, impede, etc., and 111 requires forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering.  So your argument is, you take out the word "forcibly," it's a lesser-included offense.

MS. MEDVIN:  It's a lesser-included offense.  If it doesn't have the assault element, it's just a lesser-included offense.

THE COURT:  Okay.  And I explain in some length, in several opinions, but in this case in the -- I guess it's an opinion of October 19, 2023, a motion to dismiss, what I thought was required under 111(a)(1)(A) in rejecting your motion to dismiss 111(a)(1)(A) and relying on Judge Moss's opinion in *Cua*, explain how I would approach a trial under 111(a)(1)(A).

So I've laid that out.  It doesn't deal with the argument you're raising right now, so I'll hear from the government on that as well.

MS. LEDERER:  Your Honor, the government doesn't have much more to add.  Starting with the most latest point that Ms. Medvin's brought up, this is brand-new to the government, so I would not be prepared to address anything on that at this point.

THE COURT:  Sorry.  Which is new that she hasn't

1    brought up?

2          MS. LEDERER:  The *Pugh* decision --

3          THE COURT:  Oh.

4          MS. LEDERER:  -- that she threw in.

5          THE COURT:  I'll look at the *Pugh* decision.

6          MS. LEDERER:  The government will as well, and if you

7    request any additional briefing on it we are happy to.  But just

8    on that point, civil disorder still requires, as you say, a

9    civil disorder.  And as for the defense's argument about the

10   linguistics of 111(a), again she's not -- or the defense is not

11   relying on any case law, just like Judge Jackson noted in her

12   other decisions that defense was just simply relying on

13   commentary.  Here, for the linguistics, defense is relying on

14   their interpretation of the definition of "another."  There is

15   no case law to support the defense's position at this time.

16          THE COURT:  What about the argument that it's a

17   lesser-included offense?  Because you take out the word

18   "forcibly," she says that the *actus reus* elements are the

19   same in both 111 and 231.  You take out the -- what she calls

20   the jurisdictional thing that it's a lesser-included offense

21   because 231 requires an act to obstruct, impede, interfere with

22   a law enforcement officer, and 111 requires forcibly assaulting,

23   imposing, resisting, impeding, etc. a law enforcement officer.

24          MS. LEDERER:  Your Honor, I had started off with based

25   off of defense's new arguments here today, I wouldn't be fully

prepared to address them, but we hare happy to take a step back
and either formulate a response right now, or if we could do it
later.

THE COURT:  Why don't you do it first, because it's
based on her contextual reading of the two statutes, and
secondly it's based on the new opinion in the Eleventh Circuit,
I gather.

MS. LEDERER:  And, Your Honor, I would just point
out that that new opinion was from January, and defense had
filed their motion only a few weeks ago.

THE COURT:  Well, we all file cases.  But the other
question you can look at, I suppose, is I don't know whether any
of my colleagues have confronted this precise argument before,
and I'm sure it's easy to find.  You have databases of published
and unpublished opinions, I'm sure.

MS. LEDERER:  Yes.  We will do our best to try to find
something.  I know that no judge has accepted the argument that
you cannot have a 231 and a 111 at the same time.

THE COURT:  Yeah, I don't know of anything either
whether the specific argument that it's really a lesser-included
offense because the elements are the same with the exception of
the word "forcibly."

MS. LEDERER:  I'm not sure if it was *Kelly* or *Camargo,*
21-CR-70, but there was a discussion of *Blockburger* in one of
those.

1          THE COURT:  I'll look at that again too.  Okay.  Is

2     there anything else on the 111 question?  Oh, she -- she makes

3     the argument about future intent to commit, but is that

4     essentially -- well, is that a separate argument?

5          Is that really a further point -- I'll ask Ms. Medvin --

6     that relates to what I've already said in my reliance on Judge

7     Jackson as to why they can't -- why one cannot be the intent

8     to commit -- I assume that's just another piece of the...

9          I've already given an oral ruling agreeing with Judge

10    Jackson on the points about the meaning of 111 and whether

11    intent to commit under 111 another felony can be another 231.  I

12    said that this morning.  And she came back and argued about the

13    definitions were "another" and "future intent to commit."  And

14    then she had this argument about the elements were the same and

15    a lesser-included offense.

16         So I take it that her first several points, and Ms. Medvin

17    can clarify, are basically making a record as to why I shouldn't

18    have followed Judge Jackson in making a new argument, and the

19    new argument is comparing the elements and the lesser-included

20    offense argument.  Is that right?

21         MS. MEDVIN:  We can treat my arguments as both

22    argument and also as an objection to the court's ruling for

23    purposes of the record.

24         THE COURT:  Okay.  Thank you.  So that's what we --

25    what you and I have to look at, and you'll file something about

1    the lesser-included offense argument, whether any other judges

2    have dealt with it or a similar issue and the relevance of the

3    *Pugh* case, and we can talk about it in any subsequent filings at

4    the end of this hearing.

5         MS. MEDVIN:  Thank you for giving us that opportunity,

6    Your Honor.

7         THE COURT:  Sure.  I need to look at it too.

8         MS. MEDVIN:  And, Judge, if I can correct the record

9    with the citations I have them for *Pugh*.

10        THE COURT:  Say that again?  Why don't you come to the

11   podium.  I'm finding it difficult to follow you.

12        MS. MEDVIN:  I have the citations for the court and

13   for the record for the cases I cite so the citation for the

14   Eleventh Circuit decision is 90 F.4th 1318 (11th Cir. 2024).

15   And for the Fifth Circuit opinion I cite from 1987, that's

16   *Gibson*, 820 F.2d 692 (5th Cir. 1987).

17        THE COURT:  What's the name of that case?

18        MS. MEDVIN:  *Gibson*.  G-I-B-S-O-N.

19        THE COURT:  All right.  Why don't we take a 10-minute

20   break and come back, and the next thing I'd like to talk about,

21   I think, is 1752(a)(1) and then 1512(c)(2) "corruptly and

22   otherwise."  And I might be able to save some time on

23   1752(a)(1).  You can think about whether more needs to be said.

24       There are essentially two lines of analysis by my

25   colleagues about what needs to be proved under 1752(a)(1): a

1    Judge Cooper *Groseclose* line of cases including *Elizade*,

2    E-L-I-Z-A-D-E, and *Samsel*, and the Judge Howell, Friedrich,

3    Chutkan line of cases.  I agree with Judge Howell.  So that

4    may shorten the argument we'll have after the break.  So come

5    back in 10 minutes or so.

6         (Recess from 10:31 a.m. to 10:50 a.m.)

7         THE COURT:  So I said before our break that the next

8    issue I wanted to discuss was 1752(a)(1), and I mentioned that

9    there are two -- basically two schools of thought on this court

10    in that I, having read the cases, agree with what I'll call the

11    Judge Howell approach, also joined by Judge Chutkan and Judge

12    Friedrich, rather than the Judge Cooper approach.

13         What does anybody want to say about that?

14         MR. HAAG:  Your Honor, given the decision, I don't

15    believe the government has anything to say on that.

16         THE COURT:  Having said what I just said, does that

17    affect Count 5 and -- I guess it affects at least parts of the

18    arguments relating to Count 5 and Count 6 as well.  Count 5 is

19    1752(a)(2) and Count 6 is 1752(a)(4).  I'm not sure.

20         MR. HAAG:  If the ruling is that the knowingly's

21    inclusive to just the (a)(1), (a)(2), (a)(4), then I don't think

22    there's anything else that needs to be said.

23         THE COURT:  Ms. Medvin?

24         MS. MEDVIN:  We of course respectfully disagree with

25    the court's ruling, and we'll note our objection for the record,

1  but there's nothing additional as far as argument.  The judge

2  has made arguments much better than I can.

3      THE COURT:  I essentially think that Judge Howell's

4  opinion -- and there were two other judges two, Judge Chutkan

5  and Judge Friedrich, but Judge Howell's opinion in *United States*

6  *v. Christopher Carnell and David Worth Bowman*, Criminal

7  No. 23-139, an opinion she issued on February 15, 2024, pretty

8  much explains the reasoning that I embrace, particularly from

9  pages 22 through 31 of that opinion.

10      So the next question, which is a legal question, is

11  1512(c)(2), and there are two questions that come up under that.

12  One is the meaning of the word "corruptly," and the other is the

13  breadth of the word "otherwise."  Those are the two primary

14  issues.  And the D.C. Circuit has decided *Fischer* and *Robertson*,

15  and there's another case recently which was more about guideline

16  -- what's the name of that again?  *Brock*. -- which talked a

17  little bit about some of these issues too.

18      But the Supreme Court has granted cert in *Fischer,* and oral

19  argument is scheduled for April 16.  And I'm not sure whether

20  they're going to deal with "corruptly" or just with "otherwise."

21  But what is the argument on both of these questions, which is

22  does "otherwise" relate back to -- is it narrow relating back

23  only to the limited-evidence instruction, or is it broader?  And

24  every judge on this court has said that it's broader with one

25  exception.

1    And the circuit has said that as well, this it's broader

2    than just evidence-related.  And with respect to the meaning of

3    the term "corruptly," the circuit has spoken about *Fischer* and

4    *Robertson*.  The way I read *Fischer* and *Robertson*, I guess, and

5    the *Gunby* trial -- I think *GossJankowski* was before *Robertson*,

6    but maybe *Gunby* was too.  So I guess I'd like to understand why

7    I shouldn't just apply the current state of the law in the D.C.

8    Circuit, or is there a dispute about what the current state of

9    the law is in the D.C. Circuit, at least until we hear *Fischer*.

10    Now, let me just say one other thing now to both sides:

11    This trial is taking place in March.  Next week.  Oh, it's April

12    1?  That has no significance.  But since it's a bench trial,

13    it's possible that I may not issue an opinion until after we

14    hear from the Supreme Court.  I'm not saying that true, but --

15    so what do we do about that?

16    I raise this to both sides because, one, what's the defense

17    view of what the law is and what I should be thinking about, and

18    two, from the government's point of view, do your defenses or

19    proving the elements change if the Supreme Court does something

20    different from the Circuit?

21    I mean, if the Supreme Court says the word "obstruct" is

22    limited, I take it that the 1512 count would just fall here as

23    it would in lots of other cases that have already been tried and

24    are about to be tried.  "Corruptly" is a little bit different

25    because I'm not sure they're going to reach it, and we don't

1    know what they're going to say, right?  So I'll hear what you

2    guys want to say and try to figure out what I should do.

3              MS. MEDVIN:  Judge Friedman, we have explained in

4    our arguments that we don't think that the *Fischer* opinion is a

5    majority opinion.  I tried presenting the confusion in writing

6    as far as the *Fischer* opinion as to what exactly is the opinion

7    of the D.C. Circuit.

8              THE COURT:  Which issue are you talking about,

9    "corruptly" or "otherwise"?

10             MS. MEDVIN:  "Otherwise."  And the opinion in *Fischer*

11   is basically three separate opinions that the various judges in

12   this court have treated --

13             THE COURT:  But weren't they three separate opinions

14   on the question of "corruptly" but in agreement between Judge

15   Walker and Judge Pan on the meaning of "otherwise"?

16             MS. MEDVIN:  Even on the meaning of "otherwise,"

17   Judge Walker conditioned his opinion.  His entire opinion is

18   conditioned on the following definitions -- I've never seen an

19   opinion --

20             THE COURT:  What do you mean it's conditioned?

21             MS. MEDVIN:  Those footnotes --

22             THE COURT:  That footnote means nothing.  Every judge

23   knows that that footnote means nothing.  His colleagues know it.

24   And they said so in *Robertson*, as I recall.  And I certainly

25   think it means nothing.

1          MS. MEDVIN:  The way that the opinion reads is that

2     it's conditional on his understanding of "corruptly."  And he

3     defines "corruptly" in the text of his opinion, and he says, and

4     because I feel this way, that is why I ruled this way.  And so

5     I'm not sure there is a majority opinion.

6          THE COURT:  All right.  What about *Fischer*?

7     *Fischer* takes Judge Pan's view.  I mean *Robertson* takes

8     Judge Pan's view.

9          MS. MEDVIN:  Yes.  *Robertson* does appear to take

10    Judge Pan's view, and especially of the wording overall.  With

11    that being said, I think the Supreme Court took it up for not

12    just the actual Pan opinion.  I think it's also for the fact

13    that the three opinions don't seem to provide a clear majority.

14    I think that is a portion of it.  That's actually what when we

15    included -- what we filed our amicus briefs we included

16    significant briefing --

17          THE COURT:  Yes, I read your amicus --

18          MS. MEDVIN:  It's complicated.  It's not simple,

19    and it's not a normal opinion that we have seen.  It's one

20    that creates more confusion, if anything.  So this is why we

21    filed to continue this case until there is resolution from the

22    Supreme Court to clarify the most serious felony charged for

23    this defendant.

24        It is the most serious felony that he's facing.  I think

25    the other ones are Class C felonies, and this one is more

1    serious; it's 20 years' imprisonment.  It's the most serious

2    one, and it's the one that guides a lot of the decisionmaking

3    in this case.  So because of that, it makes sense to wait in

4    this case one or two more months until *Fischer* because I think

5    it would change the elements of the proof that the government

6    needs to put forward.

7        THE COURT:  Well, I guess as I read Judge Pan's

8    opinion for herself and Judge Pillard in *Robertson*, and then

9    there was a dissent by Judge Henderson, she talks about what you

10   were just talking about: Judge Walker.  Judge Walker suggested

11   that his interpretation of "corruptly" might be binding on the

12   court, emphasizing its importance to him on in his decision to

13   embrace the broader meaning of "otherwise," exactly the point

14   you're making.

15       Although  Judge Walker was free to forecast in his

16   concurrence how he would interpret "corruptly" in an appeal

17   requiring that he resolve, the role the interpretation played in

18   his own thinking did not make it precedent that is binding on

19   the court.

20       In any event, if we assume arguendo that *Fischer* included

21   a holding about "corruptly," any such holding was limited to the

22   conclusion that the "corruptly" element was adequately alleged

23   in that case.  Two members of the panel agreed on the outcome

24   relying on different reasoning, a way to resolve an appeal that

25   is not unusual.

1        The lead opinion in *Fischer* determined the facts alleged in

2   the indictments were sufficient to support any definition of

3   "corruptly" but did not adopt them.  By contrast, Judge Walker

4   opined in his concurrence that it was necessary to prove that a

5   defendant intended to procure an unlawful benefit to establish

6   corrupt intent and that the allegations in that indictment were

7   sufficient.

8        So both Judge Pan and Judge Walker agreed that the

9   "corruptly" element, as well as the "otherwise obstructs"

10  element, is adequately alleged in that case, and it was not

11  necessary for them to adopt the same reasoning about the

12  definition of "corruptly" to conclude that the element was met.

13       Then they reject Judge Henderson's reading of the

14  precedential value of Judge Walker's concurrence as opposed to

15  the combination of his and Judge Pan's.  But don't they also in

16  *Robertson* tell us what a two-judge majority thinks the meaning

17  of corruptly is?  And so we've got the D.C. Circuit clearly

18  talking about what "otherwise" means.

19       You know, good chance the Supreme Court's going to disagree

20  with that, and hundreds of cases that have already been tried

21  and about to be tried will be affected.  But it seems to me that

22  the Circuit also in *Robertson*, by two-to-one vote, told us what

23  "corruptly" means.

24            MS. MEDVIN:  I think that this court follows precedent,

25  and I think it does set the precedent.  I don't think I have an

1    argument as far as that's not the current precedent.  But my

2    argument is that it's incorrectly decided.  I am hoping the

3    Supreme Court will opine on the issue.  It is in front of them.

4    While it's not the major issue, it has been pled.  It's in the

5    pleadings.  And so it is possible they will reach that.

6        We won't know until oral argument if they're concentrating

7    on it, and that's scheduled until after this trial.  So I don't

8    have input on that.  But as far as precedent, and if we are to

9    proceed today, then yes, I would say *Robertson* would have to be

10   precedent today because we don't have case law to the contrary.

11       THE COURT:  Thank you.  So if I followed precedent,

12   I'm having the broader meaning of the word "otherwise" and the

13   *Robertson* meaning of "corruptly."  And if the Supreme Court says

14   otherwise on either of those issues, then that's what the law

15   will be.  And it may also be that since this is a bench trial,

16   I won't issue an opinion until we hear from them.  Some people

17   think they may decide *Fischer* reasonably quickly, more quickly

18   than immunity.  We'll see.

19       MS. MEDVIN:  I would say it's there's not clear

20   precedent on "otherwise" still.  I still think there's confusion

21   on that element.  But as far as "corruptly," I think there is

22   precedent for *Robertson*.  I think on the word "otherwise," it's

23   still not clear as to what the precedent is because even if we

24   read *Robertson* looking at *Fischer*, they seem confused at what

25   exactly happened in *Fischer*, just like we are.  It's an

1    extremely confusing decision, one I think we've never seen

2    before to that level of confusion.

3            THE COURT:  Anything further?

4            MS. MEDVIN:  Nothing further, Judge.  Thank you.

5        Oh, I did want to add this as a note for the record.  It

6    does strike me that if we are using the broad interpretations of

7    both "corruptly" and the broad interpretation of the word

8    "otherwise," then there becomes a problem with the obstruction

9    of Congress and the lesser offenses of parading as far as in

10   front of Congress as being multiplicitous in the indictment

11   because it appears one is indistinguishable from the other.

12       And so you've got a Class B petty offense that seems to be

13   multiplicitous with a felony punishable by up to 20 years in

14   prison.  And so I think as far as an objection for the record of

15   interpreting the two broad definitions, it creates a multiplicity

16   effect.  And so for the record I'll note an objection on

17   multiplicity grounds or motion to dismiss the indictment let's

18   say an oral motion to dismiss if we're going to adopt those

19   definitions then I would move to dismiss the counts on for

20   multiplicity.

21           THE COURT:  You're going to dismiss what?

22           MS. MEDVIN:  I'll ask to dismiss 1512 on the grounds

23   of multiplicity.

24           THE COURT:  Okay.  Well, if I deny that without

25   prejudice, can you raise it either on Rule 29 or later.

1          MS. MEDVIN:  Thank you, Judge.

2          MR. HAAG:  Haag.  Your Honor, insofar as the

3     definitions of "otherwise" and "corruptly," the government's

4     position is there's clear case law on *Fischer* and *Robertson* as

5     to those issues.  I don't think the court needs to look any

6     further into the kind of horse trading went on in the *Fischer*

7     case.  Those opinions are pretty clear what the definitions for

8     those two elements are.  But I believe Your Honor had questions

9     regarding any impact of Supreme Court decision and the elements

10    before the court.  Happy to discuss those, but I have nothing

11    further.

12         THE COURT:  There's not much we can do about it other

13    than wait, I think.

14         MR. HAAG:  Thank you.

15         THE COURT:  So while we're talking about law still,

16    in October I issued an opinion on the motions in limine, and

17    I think I ruled on everything except the following:  One is

18    multimedia exhibits.  Two is locations where protectees or their

19    motorcades are taken at the Capitol.  And that led relates

20    somewhat to the restricted grounds thing which I've talked about

21    already.

22        Third was the defendant's motion in limine to exclude

23    sweeping -- quote "sweeping non-case-specific evidence

24    pertaining to events of January 6, 2021, as well as any

25    generalized testimony recounting the experience of federal

1    officers on that day."

2        So should we discuss that here now in the abstract, or

3    should we discuss it in the context of going over exhibits and

4    witnesses, or what makes the most sense?

5        MS. LEDERER:  Your Honor, I think it would make the

6    most sense to combine it with perhaps the defense's objections

7    to government exhibits because the arguments are replicated

8    within the defense's specific objections to specific exhibits.

9    But the government's happy to do whatever Your Honor would

10   prefer.

11       MS. MEDVIN:  Judge, we can go either way.  Some are

12   replicated, some are not.  The broad specific objections stands

13   for a variety of government exhibits, some we specifically note,

14   some we didn't, but we can go exhibit by exhibit.

15       THE COURT:  So the government has submitted a new

16   revised exhibit list today or over the weekend, right?

17       MS. LEDERER:  That is correct, Your Honor.  One

18   exhibit has been added, and I believe it's 434, Your Honor.

19   And there had previously been a 421.2.  When reviewing all of

20   the exhibits, that was incorrectly labeled.  It's its own stand-

21   alone exhibit, so we removed 421.2 and we made that 435 and we

22   alerted Ms. Medvin this morning of the additional exhibit that

23   was added, which was 434.  That video had been in discovery and

24   provided to defense months if not a year at this point, and of

25   course the former 421.2, now 435, had previously been on the

1    exhibit list.  Other than that, I don't believe there were any

2    additional changes to the list.

3         THE COURT:  Well, I guess what I'm -- as Ms. Medvin

4    said, if we're going to talk about the government's exhibits,

5    some of them raise these questions that were left open by my

6    decision on the motion in limine, and does it make sense for her

7    to identify those exhibits that raise those issues, or do we

8    just want to go through -- I won't say exhibit by exhibit

9    because there aren't going to be objections to some of them, or

10   maybe to the exhibits she objects to we could talk about those

11   only.  What do you suggest?

12        MS. LEDERER:  That would be the government's position,

13   if it's something that defense had previously objected to which

14   is pretty verbose it's about 40 different objections.

15        THE COURT:  What's the docket numbers of the

16   objections?

17        MS. LEDERER:  The objections are -- it is ECF 97.  And

18   then ECF 96 I believe is the government's objections, which is a

19   short list, about four objections.

20        THE COURT:  All right.  I've got -- she starts by

21   objecting to Exhibit 101.  I don't see a 101.  I just see a 102.

22        MS. LEDERER:  Your Honor, 101 is a digital exhibit.

23   It is a video montage which was provided via USAfx to chambers.

24        THE COURT:  Okay.  And her objection is that it has

25   hearsay and it raises -- so, I mean, I'm assuming from my prior

experiences in these cases that I'm not going to admit it for the truth of the matter asserted that are on the videos unless that witness testifies, and Mr. Warnagiris' statements are admissible.  So that should resolve the objection to 101, right?  If people are yelling and screaming and saying things, not admitted for the truth of the matter asserted unless it's a witness that the government or the defense calls, or unless it's the defendant.

MS. LEDERER:  Your Honor, just to provide you a little more context of what 101 is, I know I said it was just a montage.  You might have seen this specific montage in the other cases that you have done.  It is basically the United States Capitol Police complete montage, if you will.

THE COURT:  Yeah.

MS. LEDERER:  It starts from the beginning in January 6 with the fall of the initial bike racks on the west front and it then hops around to the different portions of where the main things were happening across the Capitol grounds and inside the building on January 6 and within that it's for the most part silent assignment because it's CCTV but there are police radio runs within it and there are multiple hearsay objections first off not for the truth of the matter asserted but there's also present sense impression --

COURT REPORTER:  Counsel, slow down.  Slow down.

1          MS. LEDERER:  It seems to me --

2          DEPUTY CLERK:  Our court reporter is having issues.

3          THE COURT:  Slow down.

4          MS. LEDERER:  Absolutely.  I apologize.

5          THE COURT:  It seems to me that this is a bench trial,

6    and I can rule as we go along and Ms. Medvin objects, I can't

7    rule unless I see a thing in front of me.  And if I say it's

8    excluded, then I won't consider it, if that's agreeable with

9    everybody.  The next thing that she objects to is 205,

10   two-second audio clip without context, without a time stamp.

11         MS. LEDERER:  Your Honor, I can respond to objection

12   No. 2 and have the same answer for No. 3 and 4 which cover

13   Exhibits 206 and 207.  This is all the same response.

14       Your Honor, just a little background.  If you remember

15   Ms. Medvin had asked for the exhibit list to date being moved up

16   significantly, and in order to comply with that the government

17   was overinclusive.

18       We had not yet had a Secret Service agent assigned.  The

19   agent signed is Agent Hawa, who will be testifying exhibits 205

20   and 207 are the radio runs of another potential Secret Service

21   witness that we might have been assigned, but we were not

22   assigned that witness, so we will not at this time be introducing

23   205 to 207.

24         THE COURT:  Oh, you will not be introducing --

25         MS. LEDERER:  No.

1          THE COURT:  Okay.

2          MS. LEDERER:  Those are the radio calls of another

3    witness that we thought we might have been assigned but we

4    weren't.

5          THE COURT:  The next one is Exhibit 5, CCTV footage

6    from inside the House chamber.  She says because he never

7    entered the House chamber it's irrelevant, but I'm assuming it's

8    relevant to civil disorder.

9          MS. LEDERER:  It's relevant to both civil disorder,

10   but also 1512 which is the obstruction of the official

11   proceeding.  The House was actually still on the floor, and the

12   defendant Mr. Warnagiris and a large crowd approached the House

13   chamber.

14        So did anyone, including Mr. Warnagiris, make it into the

15   House floor?  No.  But a large crowd, including Mr. Warnagiris,

16   made it right outside the House chamber, and this CCTV footage

17   shows an angle of officers -- Capitol Police officers protecting

18   the House chamber main doors where the crown, including the

19   defendant, were right on the other side.

20        Now, included in this objection defense raised that this

21   footage covers the shooting of a rioter.  That is not the area

22   where the rioter was shot.

23          THE COURT:  Okay.

24          MS. LEDERER:  And that objection has been made across

25   the board and anywhere that defense has objected to video being

1    shown because it shows a rioter being shot that's incorrect it's

2    actually tailored towards the House main doors the rioter that

3    was shot was shot at the Speaker lobby doors which was not

4    covered by the Speaker CCTVs outside the House floor area.

5              THE COURT:  All right.  Ms. Medvin, do you want to say

6    anything about that particular exhibit?

7              MS. MEDVIN:  I'm glad that was clarified for me.  I

8    thought that that was the same area.  Nothing additional as to

9    that issue.  The only thing I'll say for the court's edification

10   is we will stipulate to the fact that a civil disorder was

11   taking place.  It doesn't affect the 1512 issue the government

12   raised, but we will stipulate to the fact that a civil disorder

13   was taking place, and we'll stipulate to that separately but

14   that should make it easier as far as making decision for

15   evidence moving forward.

16             THE COURT:  Well, if you all can agree on a

17   stipulation and what it says, fine.  It's a bench trial.  If we

18   can avoid some witnesses, fine.  So you might want to talk about

19   the stipulation because it will avoid the necessity of calling

20   the witness from the Safeway, for example.

21             MS. LEDERER:  Your Honor, we had previously sent draft

22   stipulations to defense.  At this point we were not -- we were

23   not of the belief that civil disorder was something defense was

24   stipulating to, so I will say that.  But we have actually

25   brought the stipulations and we've had -- already had

1    conversations this mornings about different things that we were

2    trying to work out so we brought the stipulations in case we

3    could work out anything we'll else we'll certainly and just to

4    let Your Honor know we would be bringing in the Safeway records

5    via 902.11 with the assigned agent, which has been -- which is

6    the new way that everyone's been doing it for the past year.

7         THE COURT:  And is that 902.11 self-authentication, or

8    do we have to have an authenticator?

9         MS. LEDERER:  Your Honor, because the Safeway records

10   come with the business record exception -- or the excuse me --

11   the certification, it is admissible under both the business

12   record 803.6 but also 902.11 and I can tell you off the top of

13   my head I know in *United States v. Carpenter* which is 21-CR --

14   I can get the cite for you -- Judge Boasberg let in the records

15   with the agent because of the business certification --

16        THE COURT:  Well, it may be that if you're going to

17   have a stipulation on the Safeway stuff, you may have stipulation

18   on the records.  I don't know.

19        MS. MEDVIN:  For clarification, we would stipulate

20   that a civil disorder was taking place under the definition not

21   tat it affected interstate commerce, which is separate.  That

22   issue the government will have to prove under their burden.

23   And as far as how they wish to prove it if they feel that their

24   witness is sufficient that will be up to the court to decide.

25        THE COURT:  All right.  So Ms. Medvin objects to

1    everything in the 400 series, and one of her arguments is that

2    Mr. Warnagiris only appears briefly in the videos, and they're

3    long videos and a variety of conduct not relevant to the case.

4    And what's your -- I don't want to look at long videos or review

5    long videos.

6         MS. LEDERER:  Your Honor we did discuss the parties

7    discussed a little bit this morning to clarify for Ms. Medvin

8    that it's the government's intention to play you only what is

9    relevant but why we include the longer version of the videos is

10   for several reasons first off again the exhibit list due date

11   was moved up so we wanted to be as inclusive as possible second

12   of all it's always the government's position to give over the

13   evidence in its fullest form so that way we have not exactly the

14   quote-unquote original but a copy of the raw footage in its true

15   --

16        COURT REPORTER:  Counsel, please?  Please.  Would you --

17        THE COURT:  You're talking too fast.

18        MS. LEDERER:  I am so sorry.

19        COURT REPORTER:  It's your record.  Make one.

20        THE COURT:  All right.  At the end of the trial

21   something that has only the relevant parts on it as if I were

22   the jury.

23        MS. LEDERER:  Your Honor, we could do that one of two

24   ways, which the parties discussed.  We could either admit the

25   whole exhibit that way we're making the record clear with what

1    time stamps we're using within just one exhibit and ask you to

2    only consider the relevant portions, or we can put it down for

3    you.

4            THE COURT:  You two discuss that and decide what you

5    want to do.  Again, if this were a jury trial, we would only

6    let the jury see the stuff that comes in.  But you and

7    Ms. Medvin can figure that out.  She objects to 407 because it's

8    a duplicate of 406, and you already talked about that, I guess.

9    Right?

10           MS. LEDERER:  Yes, Your Honor, and that has been --

11   I was remiss.  I forgot to say that when you were asking about

12   the exhibit list.  We did remove 407 from the exhibit list.

13   The line is left bank, and all of -- we didn't change any of

14   the numbers, though.

15           THE COURT:  Now, there are a lot of photographs in

16   the 400 series, and I assume that those are taken from videos.

17   And there's stills from some of the videos, or are they from

18   people's cell phones or from surveillance footage or whatever?

19           MS. LEDERER:  Your Honor, to let you know, the entire

20   400 series is, quote-unquote, open-source.  So that would be

21   from either the media or from persons present on January 6 or

22   other defendants from January 6.  Some of those stills are from

23   the media.  Some of the exhibits you can see water marks say

24   Shutterstock or Associated Press would be behind them or they'd

25   be from another open-source.

1          THE COURT:  She objects specifically to 421.  This is

2     a post-January 6 commentary video not recorded during the events

3     and has nothing to do with Mr. Warnagiris, and the comments from

4     the commentators are prejudicial.

5          MS. LEDERER:  Your Honor, it is a video that weaves

6     footage from January 6 in and out of the commentary.  However,

7     it is the government's plan right now to only play the relevant

8     portion, and in fact we do have a sub-exhibit, which is the

9     clipped portion that shows Mr. Warnagiris.  And I don't believe

10    that there's any commentary behind it.

11         THE COURT:  Well, I think -- once again, it's a bench

12    trial.  Some of these things we're just going to have to visit

13    during the course of the trial, and I'll defer objections.  If

14    she still wants to make them, I'll look at them.  421.2.

15         MS. LEDERER:  Which, Your Honor, is now 435.

16         THE COURT:  So she still says that it's not relevant.

17         MS. LEDERER:  Your Honor, it shows the East Rotunda

18    lobby area as officers are pushing the crowd out.  Mr. Warnagiris

19    is pushed out not necessarily in this video, but we have other

20    video in which he is pushed out of that area and then remains in

21    the lobby for a great deal of time.  And again this list is

22    overinclusive.  We might not be introducing this in our case-in-

23    chief, but it's on our list because it is from a relevant area

24    and a relevant time.

25         THE COURT:  So 432 and 433, she objects to this in

part because of prejudice, it shows a protester being shot, and

because Mr. Warnagiris wasn't anywhere near the events in

question.

MS. LEDERER:  Your Honor, court's indulgence as I pull

up both.  Again, we will not be playing video footage of the

protester being shot, because Mr. Warnagiris does not access the

Speaker lobby area.  However, and I'm going to clarify which

exhibit it is, there is an open-source video of those Capitol

Police officers that you see in CCTV Exhibit 3515 pointing the

gun through the House main doors, which is not where the

protester was shot.  And that would be at the time that the

defendant was present in that crowd in that area.

THE COURT:  Well, I'll have to see later.  There's a

separate filing that she made on October 20, Docket 98,

objecting specifically to Government 316.  And I don't see a

316 in the notebook you gave me.  What is 316?  Or has it been

numbered or something?

MS. LEDERER:  Your Honor, the 300 series is CCTV.

so I believe it would be CCTV.  I do not have 98 right in front

of me.

THE COURT:  Do we have the availability to look at

316?

MS. LEDERER:  Your Honor -- thank you.  My colleague

just clarified.  It was a late, add-on video from the east front

which shows the crowd overwhelming officers on the east front

1    and running up.  And I believe the objection was because it was

2    added after the exhibits were due.

3            THE COURT:  Oh, is it an objection because it was late

4    filed or for other reasons?

5            MS. MEDVIN:  I believe that one was late filing.  And

6    that objection would also run into some other exhibit that they

7    submitted yesterday past the deadline that the court provided to

8    the government for the list.  But whatever objection we had

9    would be in their.  I haven't pulled up my video.

10            THE COURT:  That's fine.  Well, as I read your filing,

11    it's primarily late filing, and it doesn't depict Mr. Warnagiris --

12    it seems to me that unless either side can show prejudice from

13    late filing of exhibits, I'm going to reject that argument, and

14    we still have another week to go before trial.  But the prejudice

15    argument we will deal with when we get there.

16        Okay.  So 601 says the property receipt for the search

17    warrant.  Why is it relevant?

18            MS. LEDERER:  Your Honor, the property receipt is

19    relevant because it is the itemized list of the items seized

20    from Mr. Warnagiris's House during the search warrant that

21    relate back to items he wore on January 6.

22            THE COURT:  I take it it would be a law enforcement

23    officer to talk about the search or the recovery of items.

24            MS. LEDERER:  Yes, Your Honor.

25            THE COURT:  Now, I don't understand 602.  Well, it's a

1    481-page report of items taken from his mobile phone.  And it's

2    almost a year long.  And she says that a lot of this is hearsay,

3    a lot of it's prejudicial, a lot of it's irrelevant.  I'm

4    assuming that you're not going to introduce all of this.

5          MS. LEDERER:  Correct, Your Honor.  The report has

6    been included because it shows the front page of the Cellebrite

7    report identifies the phone that was searched, the IMEE number,

8    the timing of when it was searched.  So it's included in there

9    just basically for the same reasons that we're including the

10   full video, because we're providing the raw evidence.  However,

11   we also have the sub-exhibit, which is 602A, that has the

12   relevant exhibits that the government intends to admit.

13         THE COURT:  602A?

14         MS. LEDERER:  Yes, Your Honor.

15         THE COURT:  So in terms of what I -- Ms. Medvin can

16   focus on her objections on when we get there are the things you

17   actually want to introduce as evidence from within 602, and I'll

18   rule on those things as you offer them.  I don't have to look at

19   everything in here Ms. Medvin probably has, which is why she's

20   included that some of it is immaterial, irrelevant, prejudicial.

21   And the government will offer portions of 602 which it thinks

22   relevant and probative.  It's just something that Ms. Medvin can

23   object at the time.

24       There is some benefit to the fact that this is a bench

25   trial in that I don't have to decide everything in advance.  And

1    I certainly don't have to look at everything in 602.

2    MS. MEDVIN:  Also, the government did provide this

3    morning the new exhibit that they're discussing, 602A.  We

4    haven't had a chance to review everything.  We might have to

5    upload something in response of what we would get from that, I

6    guess, in a sense so that there is no surprise element as far as

7    the particular issues they want to concentrate on.  But it --

8    I would say that potentially I'd have to add additional evidence

9    that was not in our evidence list in response to the selective

10   evidence.

11   THE COURT:  Well, I think -- that's always the

12   defense's right.  I mean, you provide a an exhibit list, and

13   you provide a witness list based on your best planning and

14   preparation.  But it's always true when the government is done

15   with its case there may be some things that were a surprise or

16   that were emphasized that you didn't think were emphasized in

17   order to complete the record, particularly in texts and email

18   exchanges and stuff.  So long as you've got a good reason for it

19   not being on your exhibit list, I'm not going hold you to your

20   exhibit list if it's important to refute what they're doing.

21   MS. LEDERER:  Your Honor, that is also why the

22   government did include the full phone --

23   THE COURT:  I understand.

24   MS. LEDERER:  -- dump and as well as the full video

25   dump which we've partly discussed in relation to the videos this

1    morning is that it's always there so in case either party needs

2    to pivot in reference --

3            THE COURT:  Okay.

4            MS. LEDERER:  -- it's an option.

5            THE COURT:  There are certain photographs that she

6    objects to.  605, 606, 607, those are all things that have been

7    saved to Mr. Warnagiris's phone.  And she says this is not a

8    part of Mr. Warnagiris -- or there's proof it was deliberately

9    saved.  And it would be confusing, irrelevant, prejudicial, and

10    not authenticated.  That's 605, 606, 607.

11            MS. LEDERER:  And Your Honor, you can let me know what

12    is easier.  I have flagged the photographs that the government

13    is not going to use in its case-in-chief.  If you want me to

14    eliminate those now, I will, but if you want me to go line by

15    line, I'm happy to go --

16            THE COURT:  Go line by line.

17            MS. LEDERER:  Absolutely.  So for 605, to the point

18    that this was either saved by opening an email or text, there's

19    no indication that it got somehow automatically saved to his

20    phone from just simply opening an email or a text.  So all that

21    goes to a weight argument at the end with you versus an

22    admissibility.  However, 605 specifically -- and, Your Honor, if

23    you would like, I can --

24            THE COURT:  I see it.  I've got a copy of it.

25            MS. LEDERER:  Okay.  Your Honor, that is the Capitol

1    on January 6, and it's safe to assume it goes to knowledge,

2    intent, motive.

3              THE COURT:  All right.  We'll talk about it at trial.

4              MS. LEDERER:  Your Honor, 606, which is --

5              THE COURT:  We'll talk about all of them at trial.

6              MS. LEDERER:  Okay.

7              THE COURT:  608.  She says it's irrelevant because

8    it's a different date.  It's not irrelevant if he's wearing the

9    same jacket.  It helps identify him.

10             MS. MEDVIN:  To notify the court, the defense is also

11   going to be stipulating to identity.  We've let the government

12   know they don't need to prove that element.  We'll be

13   stipulating to identity to make things a little easier.

14             THE COURT:  Okay.  If you all agree on a stipulation,

15   that's fine.

16             MS. LEDERER:  Your Honor, just as a blanket response,

17   I know a lot of defense's position is, oh, these photos are now

18   rendered not relevant because we're stipulating to identity.  A

19   lot of these photos still go to knowledge, intent, motive, lack

20   of mistake from that day, just so you have our blanketed

21   response to those blanketed objections.

22             THE COURT:  Well, I think with respect to all of her

23   objections to the following in the 600 series, we're probably

24   better waiting till trial than going through them now unless

25   there's some specific ones that Ms. Medvin thinks she needs a

1    ruling on pretrial.  They're all photographs or screenshots or
2    things taken from videos or phone or whatever, and many of them
3    do depict him, some of them don't.  It seems to me that I'm
4    better off waiting to hear the context in which they're -- in
5    which they're offered rather than trying to decide today.  I
6    don't think it's worth all of our times to do that.

7        I do want to -- 701 is a demonstrative video, and she says
8    it's irrelevant and prejudicial.

9        MS. LEDERER:  Your Honor, starting with the
10   prejudicial argument, again defense ties this compilation, which
11   is just a recording from both the Senate and House floor, ties
12   this to the shooting.  There's no shooting shown on this video.
13   701 is literally the --

14       THE COURT:  With respect to all of these compilations
15   and things that you prepared, you're going to need to tell me
16   which particular counts they're relevant to when we get there.
17   It seems to me that -- I mean, the objection is that it's
18   irrelevant, and I know that and it's not a jury trial; and
19   it's prejudicial, and I know that and it's not a jury trial.

20       These other things may be relevant to some counts but not
21   others.  And again, it seems to me that some of them are
22   relevant to whether a civil disorder was going on, and some
23   of them may be relevant to impeding the certification, and
24   you just need to tell me as you offer them.

25       MS. LEDERER:  And, Your Honor, to let you know why we

1    grouped the exhibits the way we did, the entire 700 series

2    really goes to the 1512 specifically.

3              THE COURT:  Which series?

4              MS. LEDERER:  The 700 series goes to the 1512 counts.

5    Specifically, 701 is a video compilation of both the House and

6    the Senate as they made their way through the electoral

7    certification process and dealt with objections.  Peppered

8    through that compilation are the additional exhibits, different

9    amendments, the congressional record.  It's just pieced-together

10   portions of evidence from that day that explain the certification

11   process and give a timeline of what was interrupted when and

12   what was going on.

13             MS. MEDVIN:  Judge Friedman, this exhibit, the way

14   it's presented --

15             THE COURT:  Which exhibit?

16             MS. MEDVIN:  The 701.  The exhibit the way it's

17   presented is a type of testimony?  It's like a PowerPoint in a

18   sense where there's video, there's a timeline, there's select

19   quotations, and it's presenting a type of testimony as to what

20   happened, but I can't cross-examine.

21             THE COURT:  Yeah.

22             MS. MEDVIN:  It's going to an ultimate issue on

23   1512(c)(2), and I can't cross-examine, and it's highly

24   prejudicial.  It's -- I'm not even sure how to characterize

25   something like this.  I've never seen the government do anything

1    like this.  All I know is I can't cross-examine that video.

2    MS. LEDERER:  Your Honor, if I may explain a little

3    bit more about 701.  I said weaved into 701 are the different

4    exhibits that are also included in the 700 series, like the

5    congressional record.  So this isn't testimony --

6    THE COURT:  Well, I have questions about whether I

7    need to admit the congressional record and all this other stuff,

8    the Constitution and everything.  Don't you have the Sergeant at

9    Arms or somebody testifying about all that?

10    MS. LEDERER:  Your Honor, we can, but also because

11    these exhibits are all self-authenticating and they're public

12    record that establish the fact that a official proceeding was

13    occurring on January 6 --

14    THE COURT:  In prior trials that I've had, there was

15    a questions about whether these things should come in.  And they

16    called a witness instead as I recall, and I didn't admit them in

17    evidence, but I'm not entirely sure about that.  But this is a

18    bench trial.

19    So I guess the question for both of you is do we need to

20    hear from the Sergeant at Arms -- or I think I heard from the

21    General Counsel or the Deputy General Counsel of the House or

22    the Senate, and it took a long time for that person to say

23    here's the relevant constitutional provision, here's the

24    relevant statute, the Electoral Count Act, here's the

25    certification thing.  Here's this, et cetera, et cetera.  And

1    here's the current resolution, and all this sort of stuff and

2    congressional record and relevant parts of it.

3         So I want you to talk to each other, because if there's a

4    legitimate objection to including this stuff as an exhibit, it

5    seems to me that it's more so in a jury trial wherein a jury

6    might look at -- start doing its own interpretation of the

7    Constitution or something, right?  And I didn't want to tell

8    them: When you read this provision and Article II, it means X;

9    and when you read this provision in the statute, it means Y.

10   They don't have to know that.

11        So what we had instead was the General Counsel and a

12   Sergeant at Arms saying, here's the deal.  Now, if Ms. Medvin

13   wants to pursue her objections in a bench trial and you bring in

14   those people to testify for hours on end, that's one alternative.

15   The other alternative is for these things to be admitted in

16   evidence, or for me as the factfinder and the law finder to take

17   judicial notice of the relevant constitutional and statutory

18   provisions.

19        MS. LEDERER:  Your Honor, we are proposing the middle

20   ground, that we admit the 700 series.  Because, first off, the

21   701 montage, perhaps you viewed it during the hour-plus-long

22   testimony of a Sergeant at Arms or a General Counsel.

23        THE COURT:  Maybe I did.

24        MS. LEDERER:  That is played along with those witness

25   so they can pause and say, oh, this is when we brought the box

1    of votes in; this is when the objection happened.  What we would
2    like to do here is admit 701 as well as the additional series of
3    -- because we have to create a record and build a record.

4        We know that Your Honor knows the amendments and knows what
5    happened on January 6.  However, we have a record to protect, so
6    we plan to admit the 700 series and then let Your Honor -- we
7    can skip over explaining what the certification process was
8    because each exhibit builds off each other, it will explain what
9    happened on January 6, and then the defense can object to all of
10    them, boom, record preserved.

11        THE COURT:  All right.  We'll look at a couple of
12    these montages between now and next Monday.  You and Ms. Medvin
13    can talk and figure out what's the most efficient way to do it
14    that is not objectionable --

15        MS. LEDERER:  And, Your Honor, our plan was not to
16    save the time of the court, but also the time of the House and
17    Senate witnesses and not call that witness, but to admit all of
18    the exhibits because they are all self-authenticating and they
19    all are admissible and then we can all make the appropriate
20    arguments that we need to make.  So that is the government's
21    plan at this point, and we can arrange for a Sergeant at Arms,
22    any House or a Senate witness to talk about the certification
23    process but our position is since they're all admissible we'd
24    like to save everyone's time and just submit those.

25        THE COURT:  We're getting near the end of your exhibit

1    list.  What's 801, and why isn't it hearsay?

2            MS. LEDERER:  Your Honor, 801 is a part of the Safeway

3    exhibits.  801 is an email that went out to the Safeway stores

4    --

5            THE COURT:  So it's not really being entered for the

6    truth of the matter; it's being entered to show what the Safeway

7    did in response?

8            MS. LEDERER:  Yes, Your Honor.  And I believe it's

9    also included in the -- I know there could be hearsay within

10   hearsay, but it's also included in the certification from the

11   Safeway employee that acknowledged all of the documents.

12           THE COURT:  What about the two exhibits from Mayor

13   Bowser?

14           MS. LEDERER:  Your Honor, 805 is a not a political

15   diatribe as the defense categorizes, but it is an official

16   record from the D.C. government that issued the curfew at

17   6 p.m., which then caused Safeway to close down, which then

18   affected interstate commerce.  So 805 is self-authenticating;

19   it's admissible because it's a public record.

20           THE COURT:  Okay.  Ms. Medvin, what if anything do you

21   want to say right now about the 800 series?

22           MS. MEDVIN:  These have to do with the time period

23   after the defendant left the area.  These have to do with 6 p.m.

24   and later.  They're not even taking place at the same time as

25   the defendant was there.  And the political diatribe, I am very

1    certain about that.  I've never seen an order of this nature.

2    It just talks about how much she doesn't like about Trump.  It's

3    like a strange order.  And it has to do with Covid and other

4    things, and it's not related to the issues at hand.

5            THE COURT:  We'll take a look at it and see what I

6    think.  To the extent that she sent -- that somebody that's the

7    store manager or somebody high up in Safeway issued something

8    earlier in the day, this does affect the effect on commerce

9    requirement.

10           MS. LEDERER:  Yes, Your Honor.  And just to let you

11   know with not only the Safeway exhibits when they were issued,

12   but also the tweet that was sent out by the mayor was tweeted

13   2:31 p.m. on January 6, which indicated that a curfew would be

14   occurring at 6 p.m.  So the civil disorder was already ongoing,

15   and 2:31 p.m., Christopher Warnagiris is outside the House main

16   doors as representatives were being actively evacuated.

17           THE COURT:  Yeah.  All right.  I don't know that we --

18   it's a quarter to 1:00, and we need to talk about -- anything

19   else Ms. Medvin wants say to elucidate any of her objections to

20   any of the exhibits that she thinks needs to be said before

21   trial?  We need to talk about the government's witness list.  We

22   need to talk about the defense possible witnesses and the

23   exhibit list.

24       I'm not sure we have to talk about the bench instructions

25   right now because we've covered a lot of it already.  But the

1    question is how much longer will this hearing today require,

2    because I'm getting hungry, and it's a quarter to 1:00.  And so

3    we can take a short break and try to finish in half an hour, or

4    we can takes time for lunch and come back in an hour.

5             MS. LEDERER:  Your Honor, we will defer to your staff

6    and the stenographer.  If anyone needs a break right now, I know

7    that I have a motor mouth, but...

8             MS. MEDVIN:  I would suggest a lunch just because I

9    know I have raised a lot of issues.

10            THE COURT:  You need to get your thoughts together,

11   everyone.

12            MS. MEDVIN:  Sure.  I mean, I can keep going.  I don't

13   really need the time for myself --

14            THE COURT:  No.

15            MS. MEDVIN:  -- but I did raise a lot of issues, and

16   I don't want to hold the court, especially past lunch.

17            THE COURT:  I agree with you.  So let's adjourn until

18   ten to 2:00.

19            THE DEPUTY CLERK:  Everyone on Zoom, we will resume

20   at ten to 2:00, and you can use the same login.  Thank you.

21      (Recess from 12:49 p.m. to 1:59 p.m.)

22            THE COURT:  All right.  So we're back, and I see

23   Mr. Warnagiris on the screen.  Can you hear us all right?

24            THE DEFENDANT:  Yes, Your Honor.

25            THE COURT:  And again, so he can see everybody, when

1    you speak, I suggest you come to the main podium.

2        So I guess the first thing that I want to ask or say is we

3    moved pretty quickly through the government's exhibit list and

4    the defendant's objections: Is there anything else that anyone

5    wants to raise about that or that either side wants to raise

6    about that that can't wait until the exhibits come up during the

7    trial?  And if so, I'm happy to hear you.  Let's start with

8    that.

9            (Inaudible response.)

10           THE COURT:  Okay.  And my next question for you is,

11    is there anything from this morning you either want to revisit

12    for any reason or make a record on that I didn't let you

13    sufficiently let you make your record on?

14           MS. MEDVIN:  I wanted to add to the defendant's *Brady*

15    request.  I was just having a conversation with government

16    counsel, and it's something that either I wasn't aware of or

17    missed, and so I wanted to put this on the record.

18        In this case, the defense has received a body-worn camera

19    depicting the defendant, Christopher Warnagiris.  The government

20    did articulate in an email to the defense that she found a video

21    while looking at another case, then afterwards additional videos

22    were provided.  The defense was under the impression -- I guess

23    I didn't inquire further as to how much available video of the

24    defendant there is out there.  The defense was under the

25    impression that we received the video available of the

defendant.

Government counsel has advised that the videos that we received she happened to have noticed the defendant while preparing for other cases, and so the videos depicting the defendant, which I would say are exculpatory, they show him nonviolently in the Capitol building with an American flag and picking it off the ground, there's assaults nearby, he does nothing dangerous himself, they are exculpatory for the defense as far as the trial and the sentencing.

And so there's potentially more such videos out there we weren't aware. And so I would modify our request to also include video of the defendant that hasn't been provided through *Brady* if the government is going to be able to do a video search that we also do that of the defendant because the government might be in possession of additional body cam footage depicting the defendant that isn't specified to this defendant or to this case that we're not aware of.

THE COURT: But if you're asking them to do a face trace based on his face, won't all of that show up?

MS. MEDVIN: Apparently, it didn't. So I don't know if the government can provide additional detail on the record as to why, but the evidence we have of counsel on her own provided what she stated. And so we're letting the court know this is additional information that we haven't previously discussed, but it does affect the availability of evidence to the defense and

1    the availability of usable evidence, pertinent evidence.

2            THE COURT:  I'll let the government respond, but what

3    I've seen in other cases is, typically, when the government

4    prepares for trial in the case before me, or in other cases,

5    they find -- sometimes do find additional things involving a

6    defendant before me; and in most cases that I've seen, they led

7    to the addition of felony charges to what were previously

8    misdemeanors while they were preparing for trials, and the

9    defense is kind of sorry they asked.  Anyway, you're looking

10   for exculpatory evidence, not inculpatory evidence, and the

11   government can respond to what you just said.

12           MS. MEDVIN:  And I'll say the videos do depict the

13   time frames which we didn't have previous visuals of, so we have

14   visuals of the defendant, but there might be additional video

15   out there that we're not be aware of.  But in this case, we do.

16   And I'm completely aware of that request in certain cases being

17   dangerous for the defense, and in this case I think it's

18   exculpatory.

19           MS. LEDERER:  Your Honor, I will take this in multiple

20   parts.  First off, this has been said multiple times today.

21   Defense has access to all of the body-worn cameras, just like

22   defense has access to all of materials on Relativity.  So while

23   preparing for another case, I was going through body camera.

24   And it's not a science; it's just patience and -- just patience,

25   really, and luck sometimes and this goes to the burden.

1          I will watch one body-worn camera of an officer that I'm

2     available to identify through open-source I can see a badge

3     name.  I watch that body camera, I go on Evidence.com, defense

4     has access to Evidence.com, and then I watch that body-worn

5     camera.  I then see another officer's badge.  I then find that

6     body-worn camera.  And it's just a domino effect of me sitting

7     there going frame by frame, trying to find out other officers in

8     an area.

9          While doing that in another case, I spot other defendants,

10    and I always like to help defense.  And if I spot a defendant,

11    I'm going to file that video if I spot it.  And I just created a

12    folder, and start to compile the video that I've seen in other

13    areas, video that defense also has access to.  So to have us

14    there and comb through officers to go frame by frame trying to

15    find every officer that was present in the Rotunda would be an

16    immense burden when defense can do the exact same thing.

17         I will also say that defense keeps saying that some of

18    this video could be exculpatory.  The defendant is not charged

19    necessarily with assault in that Rotunda area.  The body-worn

20    camera is from later in the day after the defendant has

21    committed the assault against Officer Warner, now Sergeant

22    Warner, and through the building remained, remained, remained.

23             THE COURT:  And we're going around and around in

24    circles here.  The bottom line is, you're preparing for a lot of

25    cases and sometimes you see stuff while you're preparing for

Case A that relates to Case B.  Now, the defendant could in

theory go through everything in the world, but that's

unrealistic.  The government goes through everything they need

to to prepare for a case while they're preparing for a case, and

if they find stuff relating to other cases, then they A, use it,

B, provide it to the defense if it's relevant to the other case.

And you provided -- if it's inculpatory in your view, or

neutral in your view, as part of your Rule 16 obligation, then

you provide it under *Brady* if it's exculpatory in your view.

But in theory, they could go through the same exercise of going

through everything, but they don't have an incentive to.  You

have an incentive to.

But I don't see how that furthers her *Brady* motion.  You

know?  I just don't get it.  I'm ready to rule on the *Brady*

motion.  I think I've heard enough.  I know what everybody's

position is.  And Ms. Medvin can say what she wants to say about

that, she can revisit any other issues from this morning, she

can make a record on any other issues from this morning, and

then I'd like to move on.

MS. MEDVIN:  Thank you, Judge.  This is a little

bit different than the other motion which was for Officer A.W.

for Officer Warner.  This in particular is for the defendant

himself.  And Ms. Lederer is right there are videos on

Evidence.Com available to all parties.  There are 34,000 body

cam videos last time I logged in.  34,000.  The problem is

1    they're not labeled in a way where it shows which defendant

2    is captured, what case it belongs to --

3         THE COURT:  She says you can put your defendant's

4    face into a face trace of the defendant.

5         MS. MEDVIN:  That's what we specifically cannot do.

6         MS. LEDERER:  Your Honor, I was explaining how I found

7    the body-worn camera, which is literally manual.

8         THE COURT:  Oh.

9         MS. LEDERER:  Sometimes in an open-source, say like a

10   Shutterstock or an Associated Press photo, a very clear photo, I

11   can find one officer's badge.

12        THE COURT:  I see.

13        MS. LEDERER:  And I search that officer's badge number

14   on Evidence.com like defense can do, and then I go a domino

15   effect.  I pause the video, I try to see another badge, and then

16   I search that officer's name.  And I do that over and over --

17        THE COURT:  But you can't do a face trace of a

18   defendant.

19        MS. LEDERER:  No.

20        THE COURT:  And you can enter an officer's name by

21   searching for his name.  Can you do a defendant's name by

22   searching for his name?

23        MS. LEDERER:  The way the body camera works that

24   MPD --

25        THE COURT:  I know how the body camera works.

1    MS. LEDERER:  That's how it's uploaded then into

2    Evidence.com, it's tagged with the officer's name, and --

3    THE COURT:  But there's no way -- there's no way --

4    there's no way to say -- well, there is a way.  We've been

5    discussing it all morning.  You go in with a face trace.  And if

6    you go in with a face trace for Mr. Warnagiris for the body-worn

7    cameras, no matter who the officer is whose body-worn camera it

8    is, you should be able to find it.

9    MS. LEDERER:  I don't want to speak if we have that

10   capability or not.  I would ask --

11   THE COURT:  I've been operating under the assumption

12   based on the briefs and all of the argument you had this morning

13   you can get photos, you can get videos, you can get body-worn

14   camera.  And that's what I'm going to order to do.  Okay?  The

15   only issues that I'm ordering you to do broader than that.  You

16   or the FBI, by doing a face trace, can get videos, photographs,

17   body-worn cameras of Mr. Warnagiris.  That's what you're ordered

18   to do before Monday.

19   Now, she wants a lot more than that.  I'm not inclined to

20   give it to her, and I feel like we're going in circles and I'd

21   like to move on.  Make your record, but we're basically done

22   with *Brady*.

23   MS. LEDERER:  Nothing further.  Thank you, Judge.

24   THE COURT:  All right.  Now, is there anything else

25   from this morning, Ms. Medvin, that you would like to revisit or

 1    make a further record on?

 2         MS. MEDVIN:  Nothing further, Your Honor.

 3         THE COURT:  So we've gone through the exhibit list.

 4    There are certain things that I've got to look at before Monday,

 5    and there are certain issues that I think I've said it seems to

 6    me that we should -- will be easier to make decisions on in the

 7    context of the actual trial when they're offered in evidence,

 8    and frankly, that's a lot easier to do in a bench trial than

 9    in a jury trial.  So we'll do that as we go forward.

10         The next thing I'd like to discuss is the government's

11    witness list, and there was some suggestion that there's a

12    possibility of some stipulations and we may not need all of

13    these people.

14         Could you just briefly -- Ms. Medvin probably knows this

15    already, but for my edification, tell me who each of these

16    people is and what they're going to testify about.  You can be

17    pretty brief, I think.

18         MS. LEDERER:  Your Honor, there is Deputy Chief

19    Thomas Loyd.  He is from the Capitol Police Department.  He can

20    discuss generally about the events of January 6 including his

21    own experiences that day.  Deputy Chief Loyd was also present

22    at the House main doors when the crowd, including the defendant,

23    approached.  So he can also talk about his time at the House

24    main doors.  Related to the Deputy Chief Loyd, I mean, we've

25    already discussed the 700 series.  We can play that video with

Exhibit 701, which is it a compilation of the Senate and House

floor.  He wouldn't be able to talk about the congressional

record or anything like that, but his knowledge of both the

Capitol and the fact that there's CCTV running, he can

authenticate the CCTV in 701.

Separate and apart, which we've already discussed, the

government can also collectively mark and move all the 700

series in and let Your Honor watch it at your own leisure,

and we can discuss in argument "official proceedings."

There's also United States Secret Service Agent Lanelle

Hawa, and she will discuss the vice president on the Capitol

grounds.

THE COURT:  Was she part of his detail?

MS. LEDERER:  She was part of the receiving detail of

the vice president.  She was stationed at the Capitol that day.

And essentially between Deputy Chief Loyd and Agent Hawa,

there's some testimony about the interactions between the two,

or between the Secret Service and Capitol Police.  But we're not

going to be repetitive in any manner.

Then there is Sergeant Warner, who is the listed

complainant in this case.  There is also agent Stephen

Weatherhead.  He will discuss generally the investigation.  Also

what's been the government's practice, as we discussed during

the exhibit discussions, that we have been admitting the Safeway

exhibits in through our case agents.  There's also potentially

1    the CART examiner in this case, and I do not have the CART

2    examiner's name of the top of my head.

3          THE COURT:  The what examiner?

4          MS. LEDERER:  The CART examiner, C-A-R-T?  That would

5    be the individual who received the phone in this case, extracted

6    the material, and then handed that material over to the agent.

7    The parties are attempting to work through a stipulation because

8    that would be very limited testimony.

9          And that the government's intended --

10          THE COURT:  You mentioned House parliamentarian.

11    Is that something there might be a stipulation too?

12          MS. LEDERER:  I'm not sure there's going to be a

13    stipulation, but as we discussed when we were going through the

14    exhibit objections, it's the government's position, because all

15    the amendments and the congressional records are self-

16    authenticating and therefore admissible, that we'd be able just

17    to mark and move those in and then make arguments, Your Honor,

18    that an official proceeding was occurring that day.

19          And that's layered on top of the fact that Deputy Chief

20    Capitol Police Officer Loyd knew what was going on that day.

21    He can't speak to the nitty-gritty, but he can speak to the fact

22    that the certification was occurring and that he knew that

23    members were in the House at a given time mainly because he was

24    right outside when rioters approached.

25          THE COURT:  Okay.  Anything you want to say about

1    their witnesses or ask about their witnesses, Ms. Medvin?

2              MS. MEDVIN:  Without revealing a lot of the defense

3    strategy --

4              THE COURT:  Sure.

5              MS. MEDVIN:  The first witness will say, I have a

6    difficult time seeing relevance.  I think he's part of that

7    general concern that I have as far as the type of evidence

8    he's going to be testifying to the government's aware the type

9    of generalized testimony and he wants to testify about his

10   experience as government counsel advised I have objection to

11   that as well because I don't see the relevance to the particular

12   charges Mr. Warnagiris is facing.

13       As far as authentication things like that I think those are

14   simple enough overall for the parties.  I think authentication

15   in this trial will be like the least of our worries.  It'd be

16   admissibility through other means that are more problematic I

17   think overall.

18       I'm not sure -- and I'll say this to the court.  I'm not

19   sure there would be stipulations that would preclude testimony

20   from any witnesses mentioned, so I would say let's count on all

21   witnesses being here.

22             THE COURT:  Okay.  I agree with that.  Anything else

23   on government witnesses?  Okay.  The defendant has submitted its

24   exhibit list, and obviously she's under no obligation to use all

25   these exhibits . You know, she's being as exclusive as she can

1    with what she knows now, and if something develops in the

2    government's case, there possibly could be more exhibits.

3         As I understand document 96, there are only a handful

4    of exhibits that the government actually objects to, and they

5    object to 56, 57, and 58.  Let's start with 57 and 58.  They say

6    this is a -- I'm sorry, 56 and 57.  A statement of facts from a

7    different January 6 case.

8         MS. MEDVIN:  I included them as a potential refreshers

9    of recollection or tools that might be used in cross-examination.

10   I don't plan on introducing them as evidence.  That being said

11   they are admissible as self-authenticating records from a

12   courthouse, and the relevance might be made apparent through

13   cross-examination.  But I'll be frank with the parties right

14   now; that's not my intent to enter them.  It's just depending

15   on the witnesses and what they say, because I've seen in some

16   pleadings some contrary information.

17        THE COURT:  Okay.  And what about 58?  You said

18   they're objecting to it in its current form; they want certain

19   things redacted.  It's a screenshot that FBI Agent Weatherhead

20   showed to Capitol Police Officer Sergeant Warner.

21        MS. MEDVIN:  So that is the exact screenshot that was

22   shown -- that was sent to me as an attachment from an email that

23   was forwarded in discovery.  That is an exact screenshot shown

24   to Officer Warner when he identified the defendant.  So I'm not

25   sure what the redactions would be.  It's in its original form

1    that was sent over through discovery.  It's up to the government

2    as far as like specifically what they wish to conceal on that,

3    but it's in the form that was provided to me.

4        MS. LEDERER:  Your Honor, the objection was not to

5    the screenshot itself.  Obviously, that was shown -- or not if,

6    that belongs to the witness.  It's admissible.  However, it's a

7    screenshot of a desktop.  So there's additional tabs open in the

8    top corner.  We were just asking to crop the screenshot so it's

9    just a screenshot of officer, not a screenshot of the desktop

10   that's behind it.

11       MS. MEDVIN:  I would submit that maybe for purposes

12   of keeping it in a public record somebody would want that

13   concealed, but if we crop it then it's not the screenshot --

14       THE COURT:  It's a bench trial.  You show it to the

15   officer the way it was shown to him, if that's the way it was

16   shown to him, and he can testify about that.  And if there's

17   some information that's concerning to the government, we can

18   redact it later and not have it in the public filing or

19   whatever.  But you should show it to him the way he saw it.

20       And I think the only other one that's at issue at the

21   moment is, it's described as a demonstrative exhibit, and it

22   says it identifies persons by name and provides transcriptions

23   of statements that will need identification by a witness.  And

24   they explain a version without labeling and transcription is

25   offered the government will not object.  So I'm not sure what to

1    make of that at this point.

2            MS. MEDVIN:  We actually provided an alternate

3    exhibit, and the government had that in advance where we took

4    out the text the government was concerned with.  So we took that

5    out from that exhibit and that's a visual aid that actually just

6    takes all of the imagery of the defendant available to us and

7    puts it into a single video and it's a total of about 19 and a

8    half minutes so that's everything related to the defendant boils

9    down to just 19 and a half minutes of video and it's all in one

10   and we put a spotlight on the defendant so it's a visual aid to

11   let the court see where's the defendant and what do all the

12   videos show collectively in time order.

13           THE COURT:  Well, if the government wants to object

14   after they look at the alternative, that's fine.  But as you

15   say, it's a visual aid, it's a demonstrative, and it's the kind

16   of thing, unless it's inaccurate in some respects, that juries

17   would be able to see as a demonstrative, but it wouldn't go back

18   to the jury room.  So it's a demonstrative, so I don't have any

19   problem in concept.

20       So with respect to your witness list, there are -- and

21   you reserve the right to call government witnesses and to call

22   additional witnesses as necessary depending on what happens in

23   the government's case, obviously officer Warner and Agent

24   Weatherhead, and Mr. Warnagiris should he choose to testify.

25   Can you tell me about the other witnesses on your witness list?

1          MS. MEDVIN:  There's another agent, Agent David Elias,

2    and he is an agent in another case where a defendant was tried

3    for -- or charged for assaulting Officer Warner in that moment

4    that the government's pinpointing to Mr. Warnagiris.  He's the

5    agent from that case.  Then there's that defendant himself from

6    that case, and another defendant who interacted with Officer

7    Warner.  So there's -- after Agent Elias are two names of two

8    defendants.

9          THE COURT:  Elias and Dillard are?

10          MS. MEDVIN:  Dillard is the defendant in another

11   January 6 case.

12          THE COURT:  Related to Elias?  Are they related?

13   Is the Dillard case the Elias case?

14          MS. MEDVIN:  Agent Elias investigated the Dillard

15   case.  The two are related.

16          THE COURT:  Have you briefed the question of whether

17   what happened in other cases is relevant?

18          MS. MEDVIN:  It might become relevant based on the

19   testimony of Officer Warner because we presented in some of the

20   pleadings to the court the issue of Officer Warner, and the

21   government's agent made a note of that as well, has confused

22   Mr. Warnagiris for another defendant.  And because of that

23   confusion and the agent's awareness of it, this might come up

24   as an issue.  And so depending on how this presents it up at

25   trial, we may or may not need to call additional witnesses for

1    clarification.

2            THE COURT:  And who's William Dunfee?

3            MS. MEDVIN:  Dunfee is a defendant who interacted

4    with Officer Warner in that video that we uncovered.  That is

5    the video that started the entire *Brady* request.  He is the

6    defendant from that case.

7            THE COURT:  And Hanson?

8            MS. MEDVIN:  The next two -- so Hanson is actually --

9    we won't need him based on the government's statements here.

10   There was a reporter from January 6 that the other name Julio

11   Rosa, that's also a -- yeah, Rosa.  That's another reporter.

12           THE COURT:  It's a what?

13           MS. MEDVIN:  A reporter.  From January 6.

14           THE COURT:  And are you planning to call?

15           MS. MEDVIN:  It will depend on if we would need to

16   admit evidence.  I think we might be able to get the particular

17   videos admitted on cross, and so we may not need him.

18           THE COURT:  Okay.  Anything the government wants to

19   say in view of those representations?

20           MS. LEDERER:  Your Honor, we'll hold our objections on

21   certain witnesses until the evidence plays out.  But to put you

22   on notice, we would intend to object to any of those witnesses

23   being called because the video will be very clear that there

24   were two assaults that happened one by Mr. Warnagiris and then

25   right after that by Mr. Dillard, so it's going to be very clear

1    the sequence of events so at that time we will object.

2        And just to clarify certain things that defense just put on

3    the record, Sergeant Warner did not confuse what two defendants

4    did; he just confused who said what, and that will be more clear

5    at trial.  So I'll just say that but I wanted to put that

6    clarification on the record since defense made a representation

7    I wanted to correct it.

8            THE COURT:  What's the status of the Dillard case, if

9    you know?

10           MS. LEDERER:  That has been disposed of, Your Honor.

11           THE COURT:  All right.  There are next on my list --

12   some of these we may have discussed or covered, I'm not sure,

13   and these I believe we agreed earlier are the remaining issues

14   -- or they were this morning from the motions in limine, because

15   I issued an opinion in October resolving most of them.  One is

16   the multimedia exhibits.  Is that -- are we talking about the

17   composites and things?  What is meant by...

18           MS. LEDERER:  It's more of a catch-all, really.

19           THE COURT:  Say that again?

20           MS. LEDERER:  It's more of a catch-all term,

21   multimedia.  It covers videos, photographs, anything that

22   was compiled from open-source but then it also does cover the

23   compilation videos.

24           THE COURT:  So is that something, Ms. Medvin, that

25   we should take on an exhibit-by-exhibit basis at trial, or is

1    there some overarching ruling that you're asking for?

2              MS. MEDVIN:  I think we can go exhibit by exhibit

3    at trial.

4              THE COURT:  The second thing is the defendant's motion

5    in limine to exclude sweeping non-case-specific evidence

6    pertaining to the events of January 6 as well as any generalized

7    testimony recounting the experiences of federal officers that

8    day.  So what does the government say about that?

9              MS. LEDERER:  Your Honor, general testimony as to

10   January 6 is relevant for multiple reasons.  First off, the

11   government does, and I know defense is going to stipulate to it,

12   but we have a record that we have to maintain is civil disorder

13   and describing -- we're not going to sit here going minute by

14   minute on January 6.  We will have it tailored to the relevant

15   portions that cover Mr. Warnagiris.  But there is background

16   information on January 6 that has to be established on the

17   record.

18       And also some of that general knowledge from officers who

19   were on the ground also goes to maybe why they made certain

20   decisions or said certain things that day.  So there's going to

21   have to be some background of what was experienced because not

22   only does it go to why officers did what they did, but it also

23   establishes all of the elements from the felonies down to the

24   Class B misdemeanors.

25              MS. MEDVIN:  Judge, he doesn't have these broad

 1   charges.  His charges are specific to his own conduct.

 2          THE COURT:  Not the civil disorder.

 3          MS. MEDVIN:  Not the civil disorder, but we will

 4   stipulate to the civil disorder --

 5          THE COURT:  They're going to have to accept a

 6   stipulation if they want the factfinder to see the context.

 7          MS. MEDVIN:  They want to see context, but civil

 8   disorder is a very simplistic definition under the law.  They

 9   made it pretty easily with just, you know, some simplistic

10   evidence.  The feelings of officers or their personal

11   experiences  have nothing to do with a civil disorder.

12          THE COURT:  Well, we'll see as the trial goes on.

13   "Sweeping non-case-specific evidence" is your

14   characterization.  The government is not going to be introducing

15   sweeping evidence.  They're going to introduce some evidence

16   that is generalized to things that happened at the Capitol that

17   day, and they'll be permitted to do so to the extent it's

18   relevant.  In a moment -- the civil disorder is -- and there are

19   other ones as well.  There are other counts of the indictment

20   that it may be relevant to, so I'm going to say you have to

21   raise it as we go along if you think it's a problem.

22          The third item in the motion in limine, the government's

23   motion as to locations where protectees or their motorcades are

24   taken to the Capitol and -- as it relates to restricted areas.

25          Now, I did talk about this in Docket 90, my opinion

1  beginning on page 4 about Secret Service protocols and location

2  operational specifics of the protected details, and I think I

3  also ruled either in this case or another one that things like

4  where specifically the vice president was taken after he left

5  the chamber where he was presiding is not going to come into

6  evidence.

7      And in view of what I've said in the past and what I said

8  today about the meaning of the term "restricted," the question

9  is what more does Ms. Medvin want me to do or say or rule -- and

10  a second related question.  Is there something I can say or do

11  or rule on today, or do we get there when you start to

12  cross-examine certain people?

13      MS. MEDVIN:  So Agent Lanelle Hawa will be testifying

14  to this issue for the government, and we're not seeking specific

15  coordinates of the location of the vice president.  It's not

16  relevant here, and we're not seeking to divulge government

17  secrets that have legitimate protective concerns, but we are

18  seeking general locational discussions as to whether -- whether

19  Vice President Pence was taken underneath the building.  I've

20  already --

21      THE COURT:  Say that again?

22      MS. MEDVIN:  Whether Vice President Pence was taken

23  directly underneath the Capitol building.  And I've cross-examined

24  her on this issue and she's said, no, he was taken to an area

25  outside of the exact underground of the building.  She's going

1    to testify to him being within the restricted perimeter, but he

2    wasn't under the Capitol building; he was somewhere else.  And

3    then she would be able to say, no, he wasn't taken to an area

4    underneath the west side, for example, something to that effect.

5    I don't have the transcript directly in front of me, but she's

6    testified to that general location.  That's all I'm seeking here.

7             THE COURT:  And that's Agent...

8             MS. MEDVIN:  That's Lanelle Hawa.  Yeah.  So it's the

9    exact -- it's similar testimony to what I've elicited from her

10   before.  It's testimony that's on the record.  It's public.

11   It's not detailed as far as the coordinates or anything of that

12   nature.

13       There's a book, a public book, just for the court's

14   edification because this might come up in cross-examination

15   there's a book published by a reporter who was with Ms. Hawa

16   and Vice President Pence and in that book the author posted

17   photographs he took of the Vice President in the vehicle he

18   describes the parking lot they were in so we know they were

19   in a parking lot underground somewhere.

20       So there's a public information as to his whereabouts that

21   come from this reporter in this book and information that's

22   already been made public record through the testimony of Lanelle

23   Hawa and other Secret Service agents.  So there is general

24   testimony as to where it is.  It's not exactly secret.  But the

25   exact coordinates are still maintained in secrecy, and we're

1    okay in respecting that.  The exact coordinates are not relevant

2    here.

3         MS. LEDERER:  Your Honor, I would just ask, when

4    defense has the opportunity to alert both the government and the

5    court as to the exact case where Agent Hawa was crossed about

6    more specifics than the general the vice president was taken to

7    a secure location within a restricted perimeter, which is what

8    the government elicits on direct, but I just want to be able to

9    double-check that transcript to see how far the location was

10   pushed and what other judges have allowed in.

11        The general concern of the government but also the Secret

12   Service is protecting national security secrets because these

13   are locations that, God forbid, have to be used in the future

14   and therefore that all needs to be protected and also there's a

15   difference between saying, hey, there's this book out here or

16   looking in the face of an active Secret Service agent and saying

17   where did this person go.  Huge difference between asking

18   someone who still has sworn to protect protectees versus saying,

19   oh, this person published something.

20        MS. MEDVIN:  The case is *United States v. DaSilva*, and

21   it's one of the cases this court has discussed as far as jury

22   instructions.  It's in front of Judge Nichols.

23        THE COURT:  So Judge Nichols permitted that testimony.

24        MS. LEDERER:  Yes, Your Honor, and I appreciate

25   counsel providing that to us.  We'll take a look so that we know

where to object, and I believe covered in the motion in limine

is that if at any point either the government has concern or

even the court would have concern as to how far we're going, we

can always resort to either going *in camera* or --

THE COURT: Well, we might be able to do that if

necessary, but the other thing you can do when you look at

*DaSilva* is look at Agent Hawa's testimony before Judge Nichols

and see what she said.

MS. LEDERER: And if we have any concerns based off

of reviewing that, we'll highlight it for the court before Hawa

testifies.

THE COURT: So the only other thing I have on my list

today, but I'm not sure how fruitful it would be right now, is

this whole debate about the bench instructions. We've talked

about a lot of those issues already, and I've ruled on some of

them. And I'm not actually giving instructions. I'm deciding

what law to apply. Now, I could tell you what I think about

some of this stuff, or we can just forget about it for now and

see where we are as the trial proceeds or as we get to closing

arguments.

MS. MEDVIN: We would prefer more information, Judge,

as to the court's thinking of the elements.

THE COURT: All right. Well, if you start with

231(a)(3), the defendant wants "what the defendant perceived."

I have no problem what adding "perceive." The government wants

1    "department" to include Legislative Branch.  The Legislative

2    Branch is not a department of the government.  Only departments

3    and agencies are.  There's the Executive Branch.  The

4    Legislative Branch is not.

5        "Instrumentality," I've never defined it before, but

6    the government suggested that the definition which was used in

7    "instrumentality," I don't know whether the defense has taken a

8    position, it comes from *DaSilva*.  You want to come back to me on

9    that, Ms. Medvin?

10            MS. MEDVIN:  I will take a look at that and come back.

11            THE COURT:  Okay.  "Official duties."  The

12    government's proposing a definition of official duties, and the

13    definition comes from *DaSilva*.  And it seems to me that that

14    definition is fine, but Ms. Medvin can take a look at that from

15    *DaSilva* too.

16        The defendant proposes to define "obstruct and impede"

17    as "to hinder a particular person or thing, interfere as to

18    interpose in a way that hinders or impedes or to come into

19    collusion or be in opposition."  I don't know if the government

20    has an opinion on that or if you want to think about it.  Okay.

21        Under 1512(c)(2), the government proposes "obstructing and

22    impede" to mean "block, interfere with, or slow the progress of

23    an official proceeding including the joint session on January 6."

24        And I gave -- there's a quote in the government's papers,

25    Docket 100 at page 4.  I gave most of that in *GossJankowski*.

1    I don't think I said "including a proceeding of the joint

2    session to certify on January 6."  On the other hand, this is a

3    bench trial, and I and other judges have said that session to

4    certify was not just a ministerial or ceremonial thing but was

5    in fact a proceeding.  So I have no problem agreeing with the

6    government.  Ms. Medvin can object, but that seems to me to be

7    what we've all said already, except for maybe one judge.

8              MR. HAAG:  Your Honor, I wanted to clarify the

9    government's position on that.  That was just to incorporate

10   the language in *Fischer* where it made the clear conclusion that

11   the certification was an official proceeding.

12             THE COURT:  I see.

13             MR. HAAG:  That was the footnote that the government

14   included was just a point to *Fischer*.

15             THE COURT:  It's not just me, it's also the Court of

16   Appeals.

17             MR. HAAG:  Exactly.

18             THE COURT:  Even more important.

19        The government's definition of "corruptly," we had this

20   discussion this morning, and I said I'm going to apply *Robertson*

21   and *Fischer*, and the same with "otherwise" from *Robertson* and/or

22   *Fischer*.

23        Still talking about 1512(c)(2), the government proposes to

24   modify the intent element of the offense by adding the language

25   "while the defendant must act with the intent to obstruct the

1    official proceeding, this need not be his sole purpose."  That's

2    at Docket 100, page 5.  And again, I don't know whether you have

3    an objection or not.

4        MS. MEDVIN:  We, of course, object.  We object to the

5    general -- anything related to 1512, and it looks at

6    instrumentality as well and I'm not sure that's correct.  But

7    we object to that of course as well as far as expanding the

8    definition.  As far as I think the court's definitions for 1512,

9    we have the Court of Appeals for *Robertson* decision at this

10   point to guide us on I think a lot of the definitions.  Not

11   *Fischer*, though.

12       THE COURT:  Look, I will conduct this trial as if

13   *Fischer* and *Robertson* are the law.  But I may not issue my

14   opinion after this trial until we hear from the Supreme Court.

15   So that really the only relevance, probably, is how you conduct

16   the trial and what you want to prove and what you want to defend

17   against.

18       The question about aiding and abetting, the government

19   has a proposal at Docket 100, pages 5 and 6.  The defendant has

20   a proposal at Docket 71, pages 26 to 28.  I'll talk to my law

21   clerks and look at *GossJankowski,* and I'll let you know.

22       Rule 111(a)(1), we spent a lot of time talking about that

23   this morning.  I told you where I come out on most of the issues

24   and that generally speaking have followed *Cua.*

25       I don't know how important this is, but in the government's

1    filing, Docket 100, pages 6 through 8, the government objects to

2    the use of the Model Penal Code definition of "assault."  And

3    I'm trying to remember whether I've dealt with this or other

4    judges have dealt with this, and I have a vague recollection

5    that I did, but maybe not in a written opinion, say that if you

6    look at various parts of the U.S. Code, they say it's -- I don't

7    know whether they define assault or bodily injury or serious

8    bodily injury.

9        I think either they -- I think they may.  You can look at

10   this somewhere.  But if not, I have another vague recollection

11   that the U.S. Code does say that their definitions are based on

12   the common law, not on the Model Penal Code.  So when you file

13   your supplemental on the other issue or issues, could you also

14   add something about that question, or you want to give me what

15   you got now?  You've got it right there.

16        MR. HAAG:  Your Honor, this was already cited to in

17   the government's brief on page 6 of document 100.  The case was

18   *United States v. Shabani* before the Supreme Court.  That's the

19   common law background principle that the U.S. Code operates on

20   common law as the background for criminal law.

21        With respect to 111(a) in particular, that statute was

22   enacted before the Model Penal Code came into existence.  There

23   became some kind of confusion with respect to the D.C. Circuit

24   opinion in *Duran*.  In that case the D.C. Circuit kind of adopted

25   the Model Penal Code without the briefing from the parties, but

subsequent to the *Duran* decision was a 2008 modification to

111(a) by Congress, which created even more kind of confusion

but I think really reiterates that the common law controls the

meaning of "assault."

THE COURT:  As you're talking, I am now remembering

that either in *Gunby* or *GossJankowski*, I said almost exactly

what you just said, including a discussion of *Duran* and why I

rejected *Duran* and went to the common law, which basically takes

us to the D.C. Code because they incorporate the common law for

definitions of "assault" and "bodily injury" and "serious bodily

injury."  Maybe one of my law clerks can find my oral ruling.

We tried earlier.  But if you put in the words "serious bodily

injury" or "bodily injury" or "assault," you find a lot of

stuff.  But maybe if we plug in *Duran* or *GossJankowski*, you can

find the transcript better than I can, remind me of what I said.

MR. HAAG:  And I believe that the government's

briefing on page 6 might be useful.

THE COURT:  So for the reasons I've said in other

cases, I reject the Model Penal Code and will apply the common

law definition of assault, serious injury serious, bodily injury.

MR. HAAG:  Thank you.

THE COURT:  Is there any dispute between you?  No.

Do you all agree that the word "forcibly" under 111 modifies all

the verbs, right?  That's *Cua*, among other things.

MR. HAAG:  Yes, Your Honor.

1        THE COURT:  The defendant -- I think the defendant in

2    Docket 71, page 19, agrees.

3        MS. MEDVIN:  Yes.  We've agreed consistently.

4        THE COURT:  All right.  752 we've discussed, and I

5    said I agree with Judge Howell, Judge Friedrich, and Judge

6    Chutkan, and the government asserts that the definition of a

7    person protected by the Secret Service should include the vice

8    president as well as his immediately family.  I said in

9    *GossJankowski* I'd limit it to the vice president only.  It may

10   depend on how the evidence plays out.

11       MR. HAAG:  I don't think it's necessarily a

12   significant issue in this case, given the facts at issue.  The

13   government's proposal was just to reflect the language of the

14   statute to say that Vice President Pence's family would qualify

15   as well.

16       THE COURT:  I'm not sure where I come out on your

17   dispute about "otherwise restricted," Docket 71 at 13 and 14,

18   and Docket 100 page 10.  I guess we should look at the

19   *GossJankowski* and *Gunby* instructions and see what I said about

20   counts 4, 5, and 6 in that regard.

21       MR. HAAG:  I don't believe the court had the

22   opportunity to address the argument raised by the defense in

23   this case in *GossJankowski* or *Gunby*.  This was an issue that the

24   government has heavily briefed before the Circuits.  In *United*

25   *States v. Couy Griffin*, we're still waiting for that decision.

That's actually where a large portion of the government's brief
here comes from was from the government's brief there.  So this
may be a matter of first impression for the court.  I just
wanted to highlight that.

THE COURT:  I have to look at this question too.

MS. MEDVIN:  These cases present a lot of novel
issues, Judge.  I wanted to make the record on my definition of
the assault definition.  Would you like me to do that at the end
of the hearing?

THE COURT:  Sure.  1752(a)(4), act of violence, the
defendant proposes an instruction, the government does not
object, that was used in *DaSilva*.  5104(e)(2)(G), the government
proposes an instruction, and I think we dealt with this in *Gunby*
but not in *GossJankowski*, but we'll look at that as well.  Yes.
The 5104(e)(2)(G) was not brought against *GossJankowski*, but in
*Gunby* -- I guess we're talking about (e)(2)(G).

I said in *Gunby* I think I gave pretty much the instruction
that the government wants.  I said the terms "parade,
demonstrate, and picket" have their ordinary meanings.  And so
you all can look at the *Gunby* instruction on page 34.  But I
think it's very close to what the government has suggested.

All right.  So that's sort of where we are.  On the
instructions we have some more work to do, and you have some
work to do, and there are a number of things you're going to
give me a brief on, including the lesser-included offense thing,

1    which is new as of this morning.

2    　　　　MS. LEDERER:  Your Honor, I would just ask that the

3    defense file its position first so that the government can

4    respond wholly to the defense's position.  I've only briefly

5    been able to look at *Pugh*, and I believe there was four live

6    issues raised by defendant in *Pugh*, and all were rejected

7    including the jurisdictional argument by the court.  So I would

8    like defense to first file how that is relevant to this case.

9    　　　　THE COURT:  Let's do this:  We've identified today a

10   number of issues that are still open, some of which are just for

11   me to go back and look and think about.  And I don't want to

12   make more work for anybody, but I'm willing to take one more

13   brief from each side somehow between now and the end of the week

14   as we're supposed to start Monday morning.

15   　　So, Ms. Medvin, I guess if you go first, when do you want

16   to file, and when do they want to file?

17   　　　　MS. MEDVIN:  Yes, Your Honor.  I can get a general

18   argument together let's say within two days, so maybe by

19   Wednesday, and then let the government respond the best they

20   can.  It's a novel concept.  I'm not going to do a complex brief

21   on it.  I'll just get the basics.  It'll be two or three pages

22   just to alert and cite everything.

23   　　　　MR. HAAG:  Your Honor, with respect to this novel

24   issue, I think as a proposal potentially we could address this

25   after the trial depending on any finding by the court it might

1     can moot out the issue.

2            THE COURT:  Well, I probably won't decide it until

3     after trial, but I still think -- look, if I tell Ms. Medvin to

4     file something on that issue and any other issues, but

5     preferably not things -- nothing that we've gone over already

6     and done and you may not like my decisions, but that's the way

7     it goes, and we will have posttrial.

8            You'll have closing arguments, you may have posttrial

9     briefs.  So it doesn't have to be anything elaborate.  But if

10    she files by five o'clock on Friday, the government can file

11    by five o'clock on Wednesday, the government can file by noon

12    on Friday because you already know what the issue is from what

13    she's raised, and you can read *Pugh*, you can read this other

14    case, you can see whether any other judges have confronted it

15    even before you see specifically what she says.  And then I'll

16    have both briefs by Friday in the afternoon and look at them

17    over the weekend.

18           MR. HAAG:  Thank you.

19           MS. MEDVIN:  I think the government was suggesting

20    that the issue not be resolved until after trial.

21           THE COURT:  Why don't you come to the podium.

22           MS. MEDVIN:  My understanding you were --

23           THE COURT:  That's what he said, yes.

24           MS. MEDVIN:  If we're doing -- we don't have an

25    objection to doing that either.  It affects the instructions in

some sense, but if the court's not taking a position, then I'm
not sure that it would change the presentation of the evidence.

THE COURT:  Well, if that's the case, it shouldn't
make more work for either of you.  Right?

MS. MEDVIN:  I think it's something that can be taken
care of after the trial, and I agree with government counsel on
that.  That's more of a legal issue.  It doesn't affect the
presentation of the facts, and if this court is willing to
reserve.

THE COURT:  And you've got to prepare for trial.
So the question of whether it's a lesser-included offense -- I'm
going to look at this *Pugh* opinion just because I'm curious, but
we've agreed now we'll take care of that after trial.

MS. MEDVIN:  Yes, sir.

THE COURT:  Do you think there's anything you're going
to want to file between now and the beginning of trial on either
side?

MS. MEDVIN:  File?  No.  But I will read one issue
into the record.  In addition to, my objection to the assault,
this is separate.  This is something as I was preparing for
trial it became apparent.  I'll just...

There is precedent on this as to the denial of this motion,
but I will read the motion into the record.

THE COURT:  Which one?

MS. MEDVIN:  So this was a motion to dismiss the

1     entire indictment against the defendant because he was

2     previously tried on this in the military, but it was not

3     a court martial.

4                THE COURT:  You mean Mr. Warnagiris?

5                MS. MEDVIN:  Mr. Warnagiris, in the military.  Not

6     court martial, but as part of a discharge proceeding was tried

7     on this exact indictment on all of the charges, and he was even

8     acquitted of the 1512.

9          And so we'll make a record to dismiss the indictment,

10    recognizing there is existing precedent that likely leads to the

11    denial, but want to preserve the motion and claim for appeal in

12    pursuant of a reversal of the contrary precedent if the claim is

13    already foreclosed, specifically because the prior military

14    tribunal and board considered Major Warnagiris's case, weighed

15    the evidence to apply the same specific federal statutes that

16    were charged now in the U.S. District Court, we claim the double

17    jeopardy prohibition --

18                THE COURT:  What are you reading from?

19                MS. MEDVIN:  From my notes.

20                THE COURT:  Oh, okay.  I thought that was a filing of

21    some sort from someplace.

22                MS. MEDVIN:  No.  I've not filed this.  I'm just

23    reading this into the record.

24                THE COURT:  Okay.

25                MS. MEDVIN:  This is a motion that would be denied on

1    precedent from the Supreme Court.

2         They considered and weighed the evidence against

3    Mr. Warnagiris and considered the specific federal statutes that

4    are now charged in the U.S. District Courts, and we claim double

5    jeopardy prohibition of the Fifth Amendment as barring retrial

6    of Christopher Warnagiris on the charges now.  Prior U.S.

7    Supreme Court precedent admittedly appears to disfavor this

8    claim in the case of *Hudson v. United States* 522 --

9         THE COURT:  Slow down.  If you're reading something,

10   the court would like to get it down accurately.

11        MS. MEDVIN:  *Hudson v. United States*, 522 U.S. 93 from

12   1997, which overruled *United States v. Halper*, 490 U.S. 435 from

13   1989.  It said administrative rulings do not count as jeopardy

14   to bar a later criminal prosecution, but we contend that these

15   cases are distinguishable and that they concerned regulatory

16   actions of administrative agencies toward highly regulated

17   commercial industries while our situation is substantively

18   different concerning the punitive discipline of active-duty

19   military offices who are later tried in district court on the

20   same exact charges and if those precedents should prove not

21   distinguishable then we should seek an outright reversal of this

22   rule by the appellate courts or the Supreme Court.  To date we

23   do not know of any case where the D.C. Circuit has considered

24   this specific issue.  Thank you.

25        THE COURT:  Thank you.

1          MS. MEDVIN:  And separately, as to the assault issue.

2          THE COURT:  Do you want to say something?

3          MS. LEDERER:  The government's position is that this

4     is absolutely ridiculous.  It is 3 p.m. at the pretrial

5     conference, and defense wants to orally bring this motion to let

6     Your Honor know that there was no retributive action taken in a

7     supposed administrative hearing.

8          Defense has not indicated when that hearing happened, has

9     not indicated a case number, and is essentially -- I'll withdraw

10    the rest of that statement.  But either something needs to be

11    filed.  If defense is asking Your Honor to consider this, it's

12    wholly inappropriate at 3 p.m. to finally bring this up and ask

13    Your Honor to consider something without giving full context of

14    what is --

15         THE COURT:  I don't know anything about it.  I don't

16    know if you know anything about it.

17         MS. LEDERER:  No, Your Honor.  So, first off, the

18    government cannot speak to it, but to let Your Honor know that

19    there's something that exists out there or that the defendant

20    was somehow found not guilty at an administrative proceeding is

21    wholly inappropriate at this time.

22         MS. MEDVIN:  Judge, as we stated, the precedent is

23    not in favor of the defendant, which is why we're just making

24    this motion orally and advising the court that the Supreme Court

25    is not on the side of the defense on this particular argument.

1          THE COURT:  All right.  Whatever.

2          MS. MEDVIN:  It's just for the record.

3          THE COURT:  It's for the record.  So I'll deny it for

4     the record.  All right.  So, look.  The trial is to begin here

5     on Monday in person.  Mr. Warnagiris, as you know, you have to

6     appear here in person for trial.  And do you want to start at

7     9:30 in the morning?  We can start at 10:00, but I'm happy to

8     start at 9:30 and get more time.

9          MS. LEDERER:  The government is at your disposal, and

10    our witnesses will be told to show up as early as nine o'clock

11    to make sure everyone is here.  But 9:30, ten o'clock, I think

12    that's better.  More time to get the evidence.

13         THE COURT:  All right.  We'll start at 9:30 on Monday

14    morning.  And you all can bring whatever boxes, exhibits, blah,

15    blah, blah, here by 9:15, let's say, and if we need any IT help,

16    we can get somebody up here to help you, but you've got your own

17    paralegals and stuff to help you -- why are you looking at me?

18         THE DEPUTY CLERK:  Ask whether counsel had an

19    opportunity to speak with anyone from OIT to get sort of

20    familiar with our courtroom equipment.

21         MS. LEDERER:  Yes.  And thank you for bringing that

22    up.  While we've been in the pretrial conference, our paralegal

23    has been working to set up to do a walkthrough, and once we find

24    out when that is, we'll ask defense counsel if they would like

25    to join us in the walkthrough.

1          MS. MEDVIN:  Thank you.

2      Judge, which common law definition of "assault" is the

3  court is using, because there are multiple definitions of

4  "assault."

5          THE COURT:  The D.C. Code.  I think that's what I did

6  in the other case.  We'll find it, and we'll let you know.

7  Well, we can now find it now by searching for the *Duran* case,

8  because I remember dealing with this expressly in *Duran* and

9  *GossJancowski* and *Gunby*.

10          MS. MEDVIN:  Because in our pleadings with the court

11  we mentioned that even under the various case law, including the

12  D.C. Circuit, "assault" was defined in various ways.  So I cited

13  a D.C. Circuit case from 1939 quoting "assault" was defined in

14  various ways.  And so there is no singular definition of

15  "assault," which causes more difficulty when we say "common law

16  assault."

17          THE COURT:  I guess I ruled to the contrary in one of

18  the earlier case that when the D.C. Code passed the assault

19  statutes, they adopted a common law definition for the district

20  of Columbia.

21          MS. MEDVIN:  Oh, okay.

22          THE COURT:  And 1939 was 1939, and the code may have

23  been amended since then.  I think I talked about this in some

24  other case.

25          MS. MEDVIN:  Okay.  Well, I'll review all of that and

1    complete objections before Monday.

2    THE COURT:  So you're going to try to meet with our IT

3    people, do a walkthrough, you're going to be here about 9:15 to

4    be organized.  When you get organized, we'll get started and

5    have opening statements and we'll see how much we get done on

6    day one and keep moving on.

7    MS. LEDERER:  The government wishes to waive opening

8    statements.

9    THE COURT:  I know a lot at this point, but everyone's

10    welcome to make an opening statement.  Many years ago, many,

11    many years ago, back when I was in the U.S. Attorney's Office,

12    there was this guy who had this theory, and his theory was, he's

13    going to waive closing argument and wait to hear from the

14    defense and then give his rebuttal and he'll have everything in

15    his rebuttal.  He wasn't the swiftest AUSA.

16    Until somebody explained to him that if he waived his

17    closing argument, the defense might waive her closing argument,

18    and then there would be nothing to rebut and he wouldn't have

19    even had the opportunity to lay out his evidence.  So it was not

20    the best strategy.

21    But opening statements are different.  Government can make

22    an opening if they'd like, and the defense obviously doesn't

23    have to but can if they want to.  So only because I think I

24    would be remiss if I didn't raise this, this is a nine-count

25    indictment.  And I assume that at some point in time there

1    either have been plea discussions or the opportunity for plea

2    discussions.  And until we actually begin this trial, if there

3    were any room for Mr. Warnagiris and his lawyer to think about

4    what they would be willing to plead to and whether the

5    government would accept a plea.

6        Alternatively, what's happened in some other cases, in

7    order to allow the defense to preserve all the legal issues they

8    raised, and Ms. Medvin has raised a lot, we can have a

9    stipulated trial.  That having been said, the fact that this is

10   a bench trial anyway, and a stipulated trial would probably take

11   half a day, and this may take, I don't know, three days,

12   something like that, maybe more.  So it may not make that much

13   of a difference.

14       But I certainly think, as the presiding judge in the case,

15   I need to say again that if there's any possibility of a plea,

16   it should be discussed and ultimately a decision whether to plea

17   or go to trial is up to Mr. Warnagiris himself, getting the best

18   advice he possibly can from his very accomplished lawyer.  And I

19   just thought I should put that on the record before we adjourn

20   for the day.  So I'll see you all at 9:30 on -- yes, sir.

21           MR. HAAG:  At risk of potentially creating ire with

22   the court, I just want to briefly address *Brady*, not the

23   argument, but just the order itself.  The government understands

24   the court's concerns, and I've been in contact with my

25   supervisors throughout this afternoon.

1         Ideally, we would like to be able to resolve defendant's

2    motion short of an order and potentially moot out the issue.

3    If the court would be willing to delay the order by several

4    days, we're going to be able to look into whether or not we can

5    comply with the court's wishes short of the order.

6         THE COURT:  Well, if you all want to try to negotiate

7    and give her what she wants, or most of what she wants, I don't

8    have an objection to that.  But I don't know if that's what she

9    wants.

10         MS. MEDVIN:  Judge, I'll say this.  The reason this

11    was continued, we had a continuance, was the parties agreed

12    through email that the government would try and resolve this

13    outside of court and we agreed.  And we agreed to continue the

14    trial date for this purpose.  And then the government came back

15    with some secretive pleading and this hearing, and we didn't

16    receive the evidence we thought we were going to get.  And so

17    because of what happened last time when we already agreed to

18    this, we wouldn't agree to it again just because of what

19    happened last time.

20         THE COURT:  Okay, look.  I won't issue anything until

21    Wednesday, okay?  Take me that long to get revisions to my

22    opinion made anyway.

23         MR. HAAG:  Thank you.

24         THE COURT:  And I know there are lots of things you're

25    concerned about, but the fact that you filed something *ex parte*

1    and under seal and that we had a hearing *ex parte* and behind

2    closed doors this morning with Mr. Rosen, I don't think that I

3    need to disclose anything that is in your *ex parte* materials or

4    in the *ex parte* proceeding without -- I don't need to use any of

5    that or disclose any of that to rule and to tell you what I

6    think *Brady* requires in the context of this case, okay?  So if

7    you come back sometime Wednesday and say we've reached an

8    agreement, great.  Otherwise, I'll give you a *Brady* order.

9    Okay?

10        Oh.  One last thing.  None of us wants to be surprised on

11   Monday morning.  If there are other issues that come up, you

12   know, you can send -- we can have a conference call, we can talk

13   to each other, you can send emails to each other or to me,

14   copying in the other side.

15        Michaela will give you her email address, and I don't want

16   to come in here Monday morning and say there's all these things

17   floating around when there's several days.  Doesn't have to be a

18   brief.  It could be just here's an issue, he's a problem,

19   logistical, procedural, substantive.  Send her an email, respond

20   to the -- copy the other side in, and we'll talk to each other.

21   Okay?  All right.  Thank you.

22              THE DEPUTY CLERK:  This court is adjourned.

23        (Proceedings adjourned at 3:13 p.m.)

24

25

* * * * * *

CERTIFICATE

      I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne